### RIDGE COUNTRY CLUB v. UNITED STATES.
### No. 8219.

Circuit Court of Appeals, Seventh Circuit.

May 7, 1943.

Chas. E. McGuire, of Chicago, Ill., for appellant.

Samuel O. Clark, Jr., Sewall Key, and S. Dee Hanson, Asst. Attys. Gen., Samuel H. Levy, Sp. Asst. to the Atty. Gen., and J. Albert Woll, U. S. Atty., of Chicago, Ill., for appellee.

Before EVANS and KERNER, Circuit Judges, and LINDLEY, District Judge.

EVANS, Circuit Judge.

We are, by this appeal, called upon to apply the Federal Unemployment and In-surance Contribution Tax Acts[1] to a golf club that hires a professional instructor and pays him a salary and also, pursuant to his employment agreement, permits him to carry on a business for his profit on the property of the club. The outcome turns upon our answer to the question,— What is the proper base for determining the tax? Should it include, in addition to the pro's salary of $1200 a year, the sub-stantial profits made by him in conduct-ing his golf shop, together with his earn-ings received from the giving of lessons to beginners and to those who believe (or know) their game may be improved by instructions from one, other than his golf partner.

The Commissioner included both rev-enues as the sum upon which the tax was computed. Plaintiff paid under protest and sued to recover that part of the sum which was based upon the pro's earnings and profits over and above the $1200 salary. The claim involved several years' payment.

The pertinent provisions of the pro's contract with the club are set forth in the margin.[2] In substance, the pro was

---

[1] The statutes are similar so the problem was discussed as a single issue in the court below, and is so treated here.

[2] The Contract:

"That the Club engages M * * * as the golf professional * * * and M * * * accepts such engagement, and agrees to act as golf professional * * * upon the terms * * * and at the com-pensation hereinafter set forth:

"1. M * * * shall serve as golf pro-fessional at the Club from April 1, 1940, to October 31, 1940 * * *

"2. That during said period M * * * agrees:

"A. To operate at *his own cost, risk, profit and expense* a high-grade golf shop for the repair and storage of clubs be-longing to the members, and for sale of golf supplies.

"B. To furnish * * * to members facilities (for) * * * storage, cleaning and minor repairing of members' clubs, *at such price as might be agreed upon be-tween M * * * and the members,* * * *

"C. To devote his full time and best ef-forts and be in attendance at the Club daily during reasonable hours, * * *

"D. To furnish at his own expense an assistant professional * * *

"E. To have in such golf shop such competent club makers * * * to the end that such shop shall be manned at all times to furnish good service * * *

"F. To keep full * * * accounts * * * in respect to the operation of the golf shop, (etc.) * * * and such records and accounts shall at all times be open to the inspection of the Club for its general information and future guidance in making contracts * * * *but in no event shall the Club participate in the profits or in-come of said golf shop or be liable for the losses or expenses thereof.*

"G. To originate, promulgate and per-sonally supervise * * * the regular or special programs of golf play planned throughout the * * * season.

"3. All of the agreements to be per-formed or furnished by M * * * per-sonally, or through the medium of a cor-poration or partnership, in which latter case the said M * * * shall devote his full time as a partner or the chief execu-tive officer of such corporation to the mat-ters of this contract.

"4. The Club agrees:

"A. To pay M * * * $1200 in in-stallments of $171.43 per month (from) * * * May * * * to November * * *.

"B. To furnish the * * * shop * * * without charge * * *. In ad-dition, the Club will furnish, without charge, all light, heat and power neces-sary for the conduct of said golf shop.

"C. That there shall be available to M * * * practice grounds * * * for * * * M * * * to give golf instruc-

to have the shop concession and teach lessons, and the club would turn over to him such funds as were by it collected for such services. Both sides emphasize the aspects of the case which are indicative of either (a) an employment status, or (b) the independent contractor relationship of the plaintiff.

The statute governs. Its applicable provisions are quoted below.[3]

■ A study of the pro's contract in the light of the statute compels us to exclude from the appellant's social security tax, the profits from the conduct of the golf shop and the lessons. These profits were gained, not as an employee, but as an independent contractor.

The pro sustained a *dual* relationship to the club. Concededly, he was an employee as to the annual retainer, yet an independent contractor when he acted as a shopkeeper and instructor.

We have not overlooked the fact that these two capacities were bound together by a single contract and that one was dependent on the other. But, looking at the single issue as to the nature of the pro's relationship to the club when giving instructions or operating the shop, we think it clear that he was an independent contractor.

Under the contract, the club furnished the shop, and its members were the persons chiefly to be served, both as to instructions, and as purchasers of supplies, although such services were not limited to club members. The club received no percentage of the income derived from such shop, or instruction fees. The pro was himself required to hire and pay the expenses of an assistant. The club promised to be an instrumentality to effect payment of charges made against its members. They billed the expenses of instruction and golf supplies to the members, and if they collected the same they paid it over to the pro. But they made no guaranty of the members' debts. Any loss was the pro's. The store was to be run *entirely* at the pro's own risk, and solely for *his* own profit. He fixed his own fees for golf instruction. All the aspects of this contract were indicative of an independent contractor relationship rather than the hiring of an employee.

Both sides point out attributes of the "employer-employee" and "independent contractor" relationships, *i. e.*, control by the employer of the employee's activities, right of discharge, etc.

All those criteria are standard tests used in the several unrelated fields of jurisprudence, *i. e.*, workmen's compensation, principal and agent, contracts, etc.

The test of the Regulation which we feel clinches the independent contractor status as to the extra work here in issue is that the control of the club was simply as to the result to be accomplished and not the means of accomplishment. The club wanted to make professional instructional services available to its members and it wanted a store ready to meet its members' golfing needs. It certainly was not

tions. The members of the Club shall have priority claims for such instructions, * * * (at) * * * such amount * * * as * * * agreed upon * * *.

"D. To bill * * * members for * * * (as he) * * * shall advise * * * and * * * to remit the same to M * * *. *The Club shall be under no obligation to pay the indebtedness of any member to M* * * *.

"5. If * * *. M * * *

"A. Shall have become unfit to serve as professional, or

"B. Shall have failed to perform his obligations * * * the Club may terminate this agreement, * * *."

3 The Statute:

"Social Security Act, c. 531, 49 Stat. 620:

"Section 801. * * * there shall be levied, collected, and paid upon the income of every individual a tax equal to the following percentages of the wages * * * received by him * * * with respect to employment * * *.

"Sec. 811. When used in this title—
* * * * *

"(b) The term 'employment' means any service, of whatever nature, performed * * * by an employee for his employer, except—
* * * * *

"Section 901. On and after January 1, 1936, every employer * * * shall pay for each calendar year an excise tax, with respect to having individuals in his employ, equal to the following percentages of the total wages * * * *payable by him* * * * with respect to employment * * * during such calendar year:
* * *

"Sec. 907. When used in this title—
* * * * *

"(b) The term 'wages' means all remuneration for employment, including the cash value of all remuneration paid in any medium other than cash." 42 U.S.C.A. §§ 1001, 1011(b), 1101, 1107(b).

dictating to the pro *how* to teach the members. The Regulations specifically point out the generally excludable occupations of the standard professions. A golf pro may be so classified, in some instances.

Of utmost importance is the wording of the statute imposing the tax—Sec. 901, 42 U.S.C.A. § 1101. It provided that the tax shall be a certain percentage "of the total wages * * * payable by *him*" (the employer). The club never paid the pro the money upon which the tax is based.

Both sides cite and rely on Williams v. Jacksonville Terminal Co., 315 U.S. 386, 62 S.Ct. 659, 86 L.Ed. 914. There, the court was determining whether the Fair Labor Standards Act, 29 U.S.C.A. § 201 et seq., which provided for minimum wage requirements, was complied with where the "red caps" reported their tips to the railroad company and if their wages *including* such tips, fell below the minimum, the company guaranteed the payment of the minimum statutory wage. The Court held such a contract constituted compliance with the statute. That statute used the phrase "every *employer shall pay* * * * *wages* * * *.*" Of course, the tips were not actually wages paid by the employer, but the Supreme Court held the legislative purpose of the enactment had been met.

We, too, look to the purpose of the statute and the intent of the legislature in enacting it, as well as the words used to carry out this intention. Only certain classes are the beneficiaries of this social legislation, consisting chiefly of the ordinary wage earners. The statute does not comprehend store keepers, professional men engaged in making their own livelihood, profiting or losing from the exercise of their own judgment, capital, and enterprise. They generally profit to a greater extent than the employed person who does not reap the entire benefit of his services, and therefore, presumably, is not able to provide for the emergencies of destitute old age, or economic depression and unemployment, and so is, more generally, in need of Government insurance against such misfortunes.

The contract which defined the rights and duties of the pro, gave him wide discretion in the conduct of his activities. His profits depended chiefly on his abilities and the time and enthusiasm he put into his work. He alone, could direct the manner in which he would execute his duties.

We conclude he was an independent contractor as to the issues here presented. The judgment of the District Court must be, and is reversed.