## STONE v. UNITED STATES.

### No. 2691.

District Court, E. D. Pennsylvania,
Sept. 17, 1943.

Edmonds, Obermayer & Rebmann, J. Warren Brock, and Frank E. Hahn, Jr., all of Philadelphia, Pa., for plaintiff.

Gerald A. Gleeson, U. S. Dist. Atty., of Philadelphia, Pa., and Lyle M. Turner, Sp. Asst. to Atty. Gen., of Washington, for defendant.

GANEY, District Judge.

This is a suit for the recovery of the sum of $280.98 alleged to have been erroneously assessed and collected from the plaintiff under Title IX of the Social Security Act, 49 Stat. 620, 42 U.S.C.A. § 1101 et seq. As originally drawn the complaint contained three counts, but leave was granted to the plaintiff to dismiss the first and third counts, and the case was heard with respect to the second count only.

With respect thereto, the Court makes the following findings of fact:

(1) This is a suit to recover internal revenue taxes in the sum of $280.98 alleged to have been erroneously paid by McMillan, Rapp & Company (now bankrupt) under the provisions of Title IX of the Social Security Act, c. 531, 49 Stat. 620, for the period January 1, 1937 to December 31, 1939.

(2) On March 8, 1941, the plaintiff in his capacity as trustee in bankruptcy for McMillan, Rapp & Company filed a claim for refund alleging that the taxes here in question were erroneously collected for the reason that the salesmen of the bankrupt were not its employees, but were independent contractors.

(3) The claim for refund was disallowed by the Commissioner on July 5, 1941, for the reasons that the evidence presented did not establish that the salesmen were independent contractors during the period in question.

(4) The bankrupt during the period between January 1, 1937, and December 31, 1939, was a corporation engaged in the brokerage business and dealing in securities.

(5) It maintained its principal place of business in Philadelphia, Pennsylvania, where it employed bookkeepers, stenographers, telephone operators, statisticians, cashier and a person who executes the orders which it receives for the purchase or sale of securities.

(6) At some time during the period in question the bankrupt employed some 27 salesmen, most of whom worked for it during the entire period.

(7) The contracts of hire between the bankrupt and the salesmen were oral and terminable at will by either party.

(8) Under the working arrangement between the parties, the salesmen were expected to devote the normal working day to producing orders for the purchase or sale of securities by the bankrupt.

(9) The salesmen were expected to report regularly to the main office of the bankrupt if working the Philadelphia metropolitan area and to attend sales conferences and meetings.

(10) Those salesmen working in territories outside of the metropolitan area were expected to keep in close contact with the main office and to attend sales meetings from time to time.

(11) Each salesman working in the metropolitan area was furnished with a desk at the main office, telephone, statistical information and reports, order blanks and office supplies in the same manner as such facilities were furnished to employees on a salary basis.

(12) The business cards used by the salesmen carried the name of McMillan, Rapp & Company together with the salesman's name.

(13) All letters written by the salesmen in connection with the securing of orders for securities were placed on the stationery of McMillan, Rapp & Company and were subject to inspection and approval, or revision, by an officer of the bankrupt.

(14) All orders taken by the salesmen were required to be turned in to the bankrupt. If for credit, or other reasons, the order was unsatisfactory to the company it was rejected. On a rejected order the salesmen were not permitted to place the order with any other company.

(15) The bankrupt was not a member of the New York Stock Exchange. All orders which customers wished to place for securities listed on the New York Stock Exchange were expected to be taken by the salesmen and turned in to the bankrupt, even though no commissions were payable to the salesmen for such services.

(16) The salesmen were paid on a commission basis, each receiving 50 per cent, of the gross profit on such business as he was able to secure for the bankrupt.

(17) In some instances the salesmen were permitted to draw advances in cash against commissions to be earned.

(18) When the bankrupt received information as to a prospective customer the lead was turned over to a salesman and he was expected to contact the party and endeavor to secure an order for a purchase or sale of securities handled by the bankrupt.

(19) The bankrupt currently advised the salesmen as to the price at which various securities were to be bought and sold, furnished information as to trends of various securities, and intended them to use the information in advising customers in securing business.

(20) All orders turned in by the salesmen were confirmed by the bankrupt in its own name.

(21) After an order was confirmed the salesmen had no further connection with the transaction. Payment was made by the customer directly to the plaintiff.

(22) In some instances salesmen were requested to make collections of a delinquent account which they had sold, but if uncollected any loss was borne by the bankrupt.

(23) Each salesman for the bankrupt was licensed by the State of Pennsylvania as a salesman of McMillan, Rapp & Company.

(24) Upon severance of business relations between the bankrupt and a salesman, notification of the fact that the salesman no longer was connected with the bankrupt was given to the state licensing authorities.

(25) Salesmen had no specific territory within which they were required to confine their selling activities.

(26) When salesmen working the metropolitan area had occasion to leave the city, 50 per cent of their traveling expenses were borne by the bankrupt.

(27) All salesmen were required to fill out a fidelity and surety bond as a prerequisite to being engaged as a salesman.

(28) In all cases when contacting a new prospect the salesmen introduced themselves as representatives of McMillan, Rapp & Company.

(29) When securities were received by salesmen from customers, a receipt was given by them in the name of McMillan, Rapp & Company.

(30) All orders were taken on blanks addressed to McMillan, Rapp & Company.

(31) None of the salesmen maintained separate offices where they held themselves out to the general public as being independent dealers in securities.

(32) In some of the larger cities outside of Philadelphia, the salesmen operated from offices maintained by McMillan, Rapp & Company.

(33) Orders taken by the officers of the company were handled in the same manner as those taken by the commission salesmen except as to the manner of paying compensation.

(34) The bankrupt issued to the salesmen an office bulletin or house organ in which various selling suggestions were made, together with instructions on the proper conduct of the salesmen.

(35) Moody's Manual was furnished each salesman.

(36) The salesmen were instructed, where possible, to secure from customers a listing of their securities holdings for analysis by the McMillan, Rapp & Company.

(37) The holdings thus secured were listed on cards which were assigned to the salesmen securing the information.

(38) Such customers were considered to be the customers of McMillan, Rapp & Company and the salesman during the time he was working for the bankrupt. No other salesman was permitted by the bankrupt to sell to such customers.

(39) When a salesman left, the holdings cards of customers were retained by McMillan, Rapp & Company as its property to be distributed to the remaining salesmen if the bankrupt saw fit.

(40) Upon entering bankruptcy McMillan, Rapp & Company retained all such holdings cards, which, as one of its assets, were later sold for a substantial sum by the plaintiff, Irvin L. Stone.

(41) The bankrupt exercised, or possessed the right to exercise, control over the salesmen to any degree reasonably necessary to the proper performance of the duties for which the salesmen were engaged.

(42) The period of employment was indefinite and at all times the bankrupt possessed the right to discharge the salesmen with or without cause.

(43) All instrumentalities, including the place of work necessary to the performance of the work by the salesmen (with a few exceptions), were furnished by the bankrupt.

(44) The work performed by the salesmen in each instance was a part of the regular business of the bankrupt.

(45) The parties, at the time the salesmen were engaged and during the period in question, believed they were maintaining a relationship in which the bankrupt possessed the right to direct not only what should be done but how it should be done and the salesmen were obligated under the arrangement to follow the bankrupt's instructions to the best of their ability.

## Conclusions of Law

█ (1) The salesmen of the bankrupt from the period of January 1, 1937 to December 31, 1939 were employees of the bankrupt and engaged in its employment within the meaning of the applicable provision of Sub-chapter IX of the Social Security Act, c. 531, 49 Stat. 620.

(2) The taxes sought to be recovered by the plaintiff were properly collected from the bankrupt and its salesmen.

(3) On the pleadings and stipulations submitted in this case the defendant is entitled to judgment dismissing the plaintiff's complaint with prejudice at plaintiff's costs.

## Discussion

The narrow question here posed is whether or not certain salesmen were employees of the bankrupt taxpayer. The pertinent provisions of the Act are as follows:

Social Security Act, U.S.C.A., Title 42, § 1101:

"Section 901. On and after January 1, 1936, every employer (as defined in section 907) shall pay for each calendar year an excise tax, with respect to having individuals in his employ, equal to the following percentages of the total wages (as defined in section 907) payable by him (regardless of the time of payments) with respect to employment (as defined in section 907) during such calendar year: * * *."

42 U.S.C.A. § 1107:

Section 907. When used in this title—
"(a) The term 'employer' does not include any person unless on each of some twenty days during the taxable year, each day being in a different calendar week, the total number of individuals who were in his employ for some portion of the day (whether or not at the same moment of time) was eight or more.

"(b) The term 'wages' means all remuneration for employment, including the cash value of all remuneration paid in any medium other than cash.

"(c) The term 'employment' means any service, of whatever nature, performed within the United States by an employee for his employer, except—* * *."

█ In determining the question here in issue it seems to me the term "employee" as used in the Act should be given a meaning as broad as may be necessary to carry out the intent and purpose of Congress as expressed in the Act as a whole. There can be no question but that the Act intended as being remedial to provide for the comfort and needs of the working man and his family in old age, as well as in times of economic distress. Its scheme contemplated not alone a contribution from the worker himself but from society as a whole to be dispensed when the worker was unable to gain a livelihood either through lack of work or for want of ability to longer work. Therefore it seems to me that it is essential to understand the objectives and scheme of the Act in order to determine the congressional intent. Accordingly when we consider when the Act came into existence, the humanitarian purposes it sought to attain, and the evils it sought to correct, one is impelled to adopt a liberal construction of the terms.

█ It seems to me clear therefore that Congress intended that one whose livelihood is dependent on another and is himself powerless to shift to society the economic burden of unemployment should be covered by the Act. General Wayne Inn v. Rothensies, D.C., 47 F.Supp. 391. The term employee is used generally to distinguish one who performs services for another from one who serves the public at large, and it is accordingly that in deciding cases involving social security laws, some courts have emphasized the importance of the rights to discharge and the question of whether the person whose status was in question was engaged in an independent enterprise for profit. Williams v. United States, 7 Cir., 126 F.2d 129; Texas Co. v. Higgins, 2 Cir., 118 F.2d 636.

Accordingly the term "employee", as used in the Act, is inclusive of the status of the salesmen of the bankrupt.

Judgment is entered for the defendant at plaintiff's costs.