**NEVIN, Inc., v. ROTHENSIES, Collector of Internal Revenue.**

**Civil Action No. 3788.**

District Court, E. D. Pennsylvania.

Jan. 5, 1945.

Wolf, Block, Schorr & Solis-Cohen, of Philadelphia, Pa., for plaintiff.

Samuel O. Clark, Jr., Asst. Atty. Gen., Andrew D. Sharpe and Robert R. Reynolds, Jr., Sp. Assts. to Atty. Gen., and Gerald A. Gleeson, U. S. Atty., and Thomas J. Curtin, Asst. U. S. Atty., both of Philadelphia, Pa., for defendant.

KIRKPATRICK, District Judge.

This is a suit to recover $1,417.40 paid by the plaintiff under protest, as Federal Insurance Contributions taxes assessed upon the earnings of certain persons described by the plaintiff as licensees but held by the Commissioner of Internal Revenue to be employees.

In 1941 the plaintiff, which operated a chain of drug stores, placed a number of them under the control of certain of its then employees, by means of what the parties designated as license agreements.

The licensees bought their fixtures and original inventories from the plaintiff, giving in payment demand notes, some of which notes have been paid, in whole or in part, while others have not, no demand ever having been made. The licensees paid the plaintiff rent for the store, the rentals being in some cases a percentage of their gross sales and in others the amount of rent which the plaintiff paid to the owner of the premises. Outside the Philadelphia area the licensees placed and paid for their own newspaper advertising, but in Philadelphia the plaintiff placed the advertising and charged the licensees a percentage of their gross sales for it.

Each licensee agreed to purchase all of his merchandise from the plaintiff, to conduct the stores in accordance with the plaintiff's instructions in matters relating to standards of service, conduct, appearance, sanitary conditions, method of operation and merchandising policies. The stores were to be operated under the plaintiff's name and the employees wore a uniform prescribed by the plaintiff. The plaintiff set the prices at which goods were to be sold. However, its control over the business was not quite complete for, in the important matter of the selection of the kinds and quantities of merchandise carried, the licensees had free choice, subject only to the limitation that they buy from the plaintiff.

In National Labor Relations Board v. Hearst Publications, Inc., 322 U.S. 111, 64 S.Ct. 851, the Supreme Court pointed out that the common law rules defining the relationship of master and servant are of very little help and, in fact, inappropriate in ascertaining the meaning of the word "employee" as used in the National Labor Relations Act, 29 U.S.C.A. § 151 et seq., and referred the determination of the whole question to the intent of Congress as disclosed by the general purpose to be accomplished by the Act. It follows from the rationale of that decision that the same mode of interpretation should be adopted in determining the meaning of the same word in the Federal Insurance Contributions Act. 26 U.S.C.A. Int.Rev.Code § 1400 et seq. Of course, the objectives of the two acts are not the same and it is quite possible that a person might be regarded as an employee for the purposes of one statute but not the other.

An elaborate discussion of general purposes to be accomplished by the Federal Insurance Contributions Act is unnecessary. One thing can be said with certainty, namely, that it was not intended to benefit persons doing business on their own account, even though restricted to some degree in their sources of supply, prices, and methods. Was it the purpose of the relationship established by these parties that the licensees should be in business on their own account?

In answering this question it is impossible to ignore entirely the factors from which the common law concepts have been evolved even though they may be discarded as tests. The legal rights and obligations involved in this disputed relationship

must therefore be examined. It is undeniable that the plaintiff retained a very large measure of control of the operation of the stores by the licensees. This is the one single element that is clearly in the defendant's favor. Concededly it is an important one. As against it, every other factor points the other way. The licensees were not obligated to devote any specified amount of time to the business and they were free to choose their own hours of work. They could not be discharged at the plaintiff's pleasure though, of course, employees as well as independent contractors may be protected by contracts for definite periods of time. They did not receive anything remotely resembling regular wages as that term is ordinarily understood, though, again, compensation for an employee's services can be determined in many ways and need not necessarily consist of regular cash payments. As a matter of fact, the question of wages is a subordinate one, because, where the relationship of employer and employee exists, whatever the employee receives for his services must be regarded as "wages." The licensees had unqualified ownership of the chief instrumentalities for the conduct of the business, including the merchandise on hand. The right to select employees and supervise their conduct in the business, though qualified by the plaintiff's veto power, was in the licensees. Finally, the licensees had a very considerable financial stake in the business.

If we look at what was accomplished as a practical matter by any one of these agreements, we find that the chief result from the standpoint of both parties was to establish a separate (though not a fully independent) business in which the licensee had a personal interest which was more nearly the interest of an owner than anything else. He could make or lose money in the business. The possibility of profits could be enhanced by efficiency, economy and skill. He took the risk of considerable personal loss in case the business was not successful—a risk which involved a good deal more than the mere possibility of loss of position. He obtained complete freedom in connection with his own time, working hours, etc., and an opportunity to increase his income not only by sales records (as in the case of a commission salesman) but by business judgment in most of the matters which are in the province of any independent retailer.

The plaintiff assured itself of a market for its goods and took the same risk in respect of its sales to the licensee as any wholesaler takes in dealing with a retailer. It relieved itself of the minutiae and responsibilities of the retail business, for example, matters of compliance with various state and municipal regulations. In fact, for all practical purposes, the plaintiff was not in the retail business, as far as the stores were concerned. It obtained a connection in which the head of the business had more than merely the incentive which a store manager or salesman would have had in the way of possible salary increases or larger commissions.

The relationship between the plaintiff and the licensees is, in short, that of a wholesaler who, in order to assure a market for his goods, has contracted with retailers that they should buy exclusively from him, allowing them, as an inducement, to use his name and good will, and of retailers who, in exchange for this benefit, have surrendered such powers to the wholesaler as were necessary for the protection of this good will.

See Standard Oil Co. v. Glenn, D.C., 52 F.Supp. 755; National Labor Relations Board v. Carroll, 1 Cir., 120 F.2d 457.

■ I, therefore, conclude that the licensees were not employees within the meaning of the Federal Insurance Contributions Act.

The statements of fact and law in this opinion may be taken as special findings and conclusions. In addition, the requests submitted are answered as follows:

I affirm the plaintiff's requests for findings of fact numbers 1 to 13 inclusive, and 16 to 18 inclusive.

I affirm the defendant's requests for findings of fact numbers 1, 2, and 3. Requests numbers 4 to 11 inclusive are interpretations of various provisions of the license agreements and need not be answered. I affirm the last sentence of the 12th request, substituting the word "considerable" for the word "such." I affirm requests numbers 13 to 15 inclusive.

In addition, I find that the license agreements P1 and P3 are typical of all the license agreements in issue.

I affirm all the plaintiff's requests for conclusions of law, and I deny all the defendant's requests for conclusions of law.

Judgment for the plaintiff, order to be submitted.