**HEARST PUBLICATIONS, Inc., v. UNITED STATES.**

**CHRONICLE PUB. CO. v. UNITED STATES (four cases).**

Nos. 25228–25231.

District Court, N. D. California, S. D. Dec. 31, 1946.

Fink & Keyston, of San Francisco, Cal., for plaintiff.

Frank J. Hennessy, U. S. Atty., and William E. Licking, Asst. U. S. Atty., both of San Francisco, Cal., Douglas W. McGregor, Asst. Atty. Gen., Andrew D. Sharpe and Arthur L. Jacobs, Sp. Assts. to the Atty. Gen., for defendant.

S. A. Ladar, of San Francisco, Cal., for Newspaper & Periodical Vendors' and Distributors' Union No. 468, amicus curiæ.

GOODMAN, District Judge.

By these four actions, consolidated for trial, plaintiff newspaper publishers seek refund of insurance contributions and unemployment taxes collected from them, for taxable periods within the years 1937–1940, upon the compensation received by vendors of their publications on the streets of the City of San Francisco who, it is claimed by plaintiffs, were not their employees. The single issue to be here determined is the status of these vendors during that period. If their relationship to plaintiffs was one of employment within the purport of the applicable statutes, Social Security Act, Title VIII and Title IX, 42 U.S.C.A. §§ 1001–1110; Federal Insurance Contributions Act, 26 U.S.C.A. Int.Rev.Code, §§ 1400–1432; Federal Unemployment Tax Act, 26 U.S.C.A. Int.Rev.Code, §§ 1600–1611, the taxes were properly imposed; otherwise not.

### The Facts.

Plaintiffs are owners and publishers of daily newspapers circulated primarily in San Francisco; a substantial portion of this circulation is effected through street sales by the news vendors whose status is here in issue. During all of the period here involved, (1937–1940) except from April, 1937 to August, 1937, plaintiff publishers and their vendors were governed in their relationship by successive written contracts between the San Francisco Newspaper Publishers' Association, as the publishers' representatives, and the Newspaper and Periodical Vendors' and Distributors' Union No. 468 representing the vendors. (The latter is a labor union chartered by the American Federation of Labor.) Three such written contracts were negotiated during the pertinent taxable period, in 1937, 1939 and 1940. However all the contracts are admittedly similar in such of their terms as are here material. And al-

though there was no written agreement between publishers and vendors from April 1937 to August 1937, their relationship was akin to that established by the succeeding written contracts, except for the exercise of a greater degree of control by the publishers over activities of the vendors in matters which were thereafter settled by the terms of the negotiated contracts.

The facts bearing on the relationship between publishers and vendors as fixed by contract and as appearing from their actual operations during the period here involved are these:

The vendors were engaged by the publishers to sell newspapers at particular street locations. Prior to 1939, such vendors would apply directly to the publishers for assignment to any vacant street corner. After 1939, the union contracts required that vendors be selected by the publishers from a list of available vendors furnished them on request by the vendors' union. The street sales locations were situated at corners characterized as full time corners, part time corners, special wrapped edition corners and special event corners. (There were also roving vendors called bootjackers who sell papers at large.) Such locations were designated, limited, changed, discontinued or re-established entirely at the publishers' discretion and in order to coincide with changing public demand. Prior to the first contract of August 1937, the services of a vendor were terminable at the will of the publisher. Thereafter, a vendor once engaged to sell at a particular location, was entitled by each of the successive contracts, to man that location so long as it was maintained by the publisher, unless there should arise just cause for the discontinuance of further deliveries of papers to him (e. g. drunkenness, failure to appear for work, etc.) or for his transfer from one location to another, in which event the publisher was entitled to effect such discontinuance or transfer. If a vendor felt that his contract to sell at a particular location had been unjustly discontinued by the publisher, —that is, without cause,—he could have the matter submitted to and determined by arbitration.

The publishers fixed the so-called "retail" price at which the papers were to be sold publicly as well as the so-called "wholesale" price, which was the amount charged the vendors for papers delivered them for sale. Once fixed, these prices remained constant for the duration of the union contract then in force. The difference between the "wholesale" and "retail" price established by the publishers was the vendor's profit. But in addition thereto, he was guaranteed by contract a minimum weekly profit. The papers which he did not sell, he was privileged to return to the publisher and received credit therefor.

Within certain limits prescribed by contract, the publisher fixed for the various types of corner, the days and hours of sale, which were established to coincide with news releases, the public's reading habits and its concentration at particular locations at particular periods.

As each edition left the press, the papers were delivered to the vendors at their corners by employees of the publishers called "wholesalers." The quantity delivered did not rest in the vendor's discretion, but depended on what it was estimated the vendor, during the selling period, could dispose of at his location. Any disagreement as to the number of papers the vendor should take appeared to be a matter for settlement between the publisher and the union.

Prior to August 1937, the wholesaler gave orders to the vendors in matters connected with the performance of their duties and disciplined them for failure to comply. But after August 1937, the wholesalers exercised little direct control over the vendors, although they did make suggestions, observed the conduct of the vendors and reported misfeasances to the publisher. Their chief function was to deliver papers to the vendors at each edition time, survey their particular district between editions to see if more papers were needed at a particular sales location, or if surplus papers should be transferred from one to another such location. However, in case a wholesaler observed conduct of a vendor warranting dismissal, the evidence shows that the wholesaler would check-in the vendor before the end of the day's selling period. But any disciplining of news vendors, short of discontinuance of sales to them, was effected by union representatives.

In their sales to the public, the vendors were required to sell complete newspapers only, with sections in such order as was designated by the publishers. They were free to offer the papers for sale as they saw fit, except that they were expected to be at their corners at press release time, to stay there during the sales period, to be able to sell papers and to take an interest in selling papers.

The vendors had no expenses to bear and assumed no business risks except the risk of loss of papers delivered to them for sale and charged against them. They provided their own transportation to and from their sales locations. Some employed substitutes. They were not prohibited from selling non-competitive publications and other articles along with their newspaper sales, and some so did. (In 1937–1940 about ⅛ of the approximate 650 vendors were selling other articles and non-competitive publications.)

The vendors were not required to submit any form of report. There were no conferences or sales meetings which they were obliged to attend, nor was it necessary that they report to the publishers' premises for any purpose.

All advertising placards and display stands or racks were provided by the publisher and the vendors were forbidden to place anything on such stands or racks except newspapers.

In all of the contracts there was contained a clause declaring it to be the intent of the parties to maintain the relationship of seller and buyer between publisher and vendor and not an employer-employee relationship. The clause was inserted at the insistence of the publishers, the vendors agreeing because their primary concern was their economic betterment. They were disinterested in the designation of their status. They were also of the belief that in any event, their relationship with the publisher would not legally be regarded as that of employer-employee.

## Discussion.

The Federal Social Security Statutes [1] do not themselves define the terms "employment," "employer," or "employee" beyond stating generally that the term "employment" means any service performed by an "employee" for his "employer." The interpretive regulations of the Treasury Department [2] adopt as their criteria the indicia of the employment relationship established by the common law. The regulations do not, —no more than does the common law,—[3] adopt any test factor or factors as complete proof of the presence or absence of the employment relationship. They and the common law which they follow, have left ample room within the pattern they have set, for extensive or restrictive development through the judicial interpretive process, to meet changing and varying circumstances. This seems clear to me, because it is evident from a study of the decisions interpreting the term "employment" in Social Security legislation, that, by and large, many courts essentially adhere to common law doctrines in reaching a desired result, while at the same time they ostensibly repudiate these doctrines in favor of newer and yet incompletely defined precepts.

The plaintiffs, pointing to the Treasury Department's interpretive regulations and to language used in federal and state court decisions, insist that common law tests control; wherefore, they argue, there is no employment relationship here present. In substantiation they point to factors in each case which, under common law principles, are "indicia" (but indicia, alone) of an independent contract relationship.

The United States contends that common law tests are not controlling, developed as they were in connection with the imposition of vicarious liability in tort and for other unrelated purposes. It advances the doctrine that in view of the broad humanitarian objectives of the national social security laws, the term "employment" as there used must be interpreted to refer to any

---

[1] Social Security Act. 42 U.S.C.A. §§ 1107, 1011; Federal Insurance Contributions Act, 26 U.S.C.A. Int.Rev.Code, § 1426(b); Federal Unemployment Tax Act, 26 U.S.C.A. Int.Rev.Code, § 1607 (c).

[2] Treas.Reg. 91 Art. 3; Treas.Reg. 90 Art. 205; Treas.Reg. 106, Sec. 402.204; Treas.Reg. 107 Sec. 403.204.

[3] Restatement of the Law of Agency C. 7, sec. 220.

service relationship not incidental to the pursuit of an independent calling.

The United States relies upon the theme developed in the case of National Labor Relations Board v. Hearst Publications, Inc., 322 U.S. 111, 64 S.Ct. 851, 857, 88 L. Ed. 1170. There, a finding of employment, in the case of newspaper vendors, by the National Labor Relations Board, within the meaning of National Labor Relations Act, 29 U.S.C.A. § 151 et seq., entitling the vendors to collective bargaining rights, was not disturbed because it had "warrant in the record" and a "reasonable basis in law." In the course of its opinion, however, the Supreme Court, in tacit approval of such finding, declared that in remedial federal legislation of the character there under consideration, the term "employment" covered a wider field than would be the case if common law principles were strictly adhered to; but that, nevertheless, it did not embrace within itself all "Persons who may perform service for another or was to ignore entirely legal classifications made for other purposes;" and that, interpreting the term in the light of the statutory objectives, "it cannot be irrelevant that the particular workers in these cases are subject, as a matter of economic fact, to the evils the statute was designed to eradicate and that the remedies it affords are appropriate for preventing them or curing their harmful effects in the special situation." This language, apparently, strikes the keynote of the Government's position that all persons performing services for others not in the pursuit of an independent calling are employees within the remedial legislation. It is obviously assumed that all such workers are peculiarly subject to the hazards of unemployment and old age indigency. (It is significant that, while propounding this legal doctrine, the Government also finds comfort in the contention that such persons really were employees even under common-law standards.)

■ The language of the Supreme Court does not, in my opinion, demonstrate the broad principle contended for by the Government. Undoubtedly it is true that the intent of Congress was to provide for the general welfare through the establishment, in advance, of a provident fund for the needy worker by a system of taxation. Whether or not the general welfare, however, will be advanced, retarded or perhaps defeated by the government-contended construction of the comparatively unabstruse term "employment" so as to include persons who heretofore have always been regarded as independent contractors, is primarily a political, social and economic question for lawmaking rather than law interpreting.[4] And until Congress has spoken expressly to include such persons, it seems more consonant with established principles of judicial statutory construction to hold that the term "employment" should properly be interpreted in a realistically practical sense, according to established common law doctrines; in favor, however, of the employment relationship in doubtful cases, because of the remedial nature of the statutory objectives. This seems to be the real, underlying motif of all the federal and state decisions,—including that of the Supreme Court—which have so far dealt with the problem of cataloguing particular factual situations either within or without the employment relationship.

■ From these various decisions there evolves at least one principle,—determinative of this cause in favor of the employment status,—entirely reconcilable with established common law doctrines as developed and grown to meet new situations, and with the remedial objectives of social security legislation, and which is, at the same time realistically practical. That is, that any person is an employee within the meaning of social security legislation who is engaged as a means of livelihood in regularly performing personal services which (1) constitute an integral part of the business operations of another; (2) are not incidental to the pursuit of a separately established trade, business or profession,—involving in their performance capital investment and the assumption of substantial financial risk,

---

[4] It could be argued that the general welfare as well as that of the aged and unemployed would be hampered if, by too broad classification, the burden of taxation upon the employer class would reach beyond its capacity to absorb the load or pass it on.

or the offering of similar services to the public at large; and (3) are subject to a reasonable measure of general control over the manner and means of their performance. Matcovich v. Anglim, 9 Cir., 1943, 134 F.2d 834; General Wayne Inn v. Rothensies, D.C.Penn. 1942, 47 F.Supp. 391; Stone v. United States, D.C.Penn. 1943, 55 F.Supp. 230; United States v. Vogue, Inc., 4 Cir., 1944, 145 F.2d 609; Lakie, Inc. v. U. S. A., D.C.Mich.1946, 70 F.Supp. 665; United States v. Wholesale Oil Co., 10 Cir., 1946, 154 F.2d 745; Twentieth Century Lites, Inc., v. California Department of Employment, 1946, 28 Cal.2d 56, 168 P. 2d 699; Deecy Products Co. v. Welch, 1 Cir., 1941, 124 F.2d 592, 139 A.L.R. 916; Jones v. Goodson, 10 Cir., 1941, 121 F.2d 176.

▇ Whether, absent any of the foregoing factors, the employment status may still be found, is not germane to the case here under consideration, (since it will be shown that all such factors are present). It presents a problem better left to future solution through the evolutionary judicial process of inclusion and exclusion. Sufficient to this case it is that the persons whose status is to be determined come well within the term "employee" as the decisions have so far reconcilably defined those factors which, when appearing in combination, establish the employment relationship in Social Security legislation.

It is, however, relevant to observe that wherever in the interpretation of Social Security legislation the employee status has been rejected in favor of the independent contractor or non-employment relationship, it has been on the basis of either the presence of a separate,—albeit interdependent, —trade business, or profession involving capital outlay and the assumption of substantial business risks, or the offering of like services to the public in general,—or of the absence of any right of control over the manner and means of performance; or of both the presence of the former and the absence of the latter factor. United States v. Aberdeen Aerie No. 24, 9 Cir., 1945, 148 F.2d 655; United States v. Silk, 10 Cir., 1946, 155 F.2d 356; Nevin, Inc., v. Rothensies, D.C.Pa.1945, 58 F.Supp. 460; Ridge Country Club v. United States, 7

Cir., 1945, 135 F.2d 718; Anglim v. Empire Star Mines Co., 9 Cir., 1942, 129 F.2d 914; Briggs v. California Employment Commission, 1946, 28 Cal.2d 50, 168 P.2d 696; Glenn v. Beard, 6 Cir., 141 F.2d 376; Texas Co. v. Higgins, 2 Cir., 118 F.2d 636; Indian Refining Co. v. Dallman, 7 Cir., 119 F.2d 417; Williams v. United States, 7 Cir., 126 F.2d 129; United States v. Griswold, 1 Cir., 124 F.2d 599; Hirsch v. Rothensies, D.C.Pa., 56 F.Supp. 92; Los Angeles Athletic Club v. United States, D.C.Cal., 54 F. Supp. 702; Spillson v. Smith, 7 Cir., 147 F. 2d 727; Gulf Oil Corp. v. United States, D.C., 57 F.Supp. 376; Nevin, Inc., v. Rothensies, D.C.Pa., 58 F.Supp. 460; Emard v. Squire, D.C.Wash., 58 F.Supp. 281.

It may be, therefore, that ultimately the employee status in service relationships of doubtful nature will be made to depend on the absence of such a separate business or calling and on the presence of some degree of control over the manner and means of performance of the services. In fact, it seems reasonable to regard persons earning their livelihood performing services for others, who have no established business or profession of their own and who are, in the performance of such services, subservient to the will of others, to be singularly subject to the hazards of unemployment and needy old age. On the other hand, those protected by capital reserve or equipped with the enterprising characteristics of a free agent, are more favorably endowed with what it takes to combat their own economic ills. A definitive limitation of the term "employment" along such lines, it seems to me, would more certainly fit into the commonly understood differentiation between persons employed by others and those self-employed, than that proposed by the Government. It also would be entirely consonant with traditional common-law precepts as they have been developed to meet a changing life picture. On the other hand, the extension of the term "employment" to the degree proposed by the Government and the inclusion not only of persons of doubtful status, but persons as well who have always been considered independent contractors,—in law and in practice,—on the basis that such persons are, as an economic fact, subject to the evils intended to be rem-

edied, is more indicative of judicial legislation than of the interpretation of legislative intent. In any event it is not of immediate importance here what eventual outer boundaries are to be placed around the definition of the term employment. For here, the vendors were performing personal services constituting an integral part of the business operations of the employer, were not pursuing any separate trade, business or profession involving capital outlay, the assumption of business risks, or the performance of like services to the public generally, and were subject to general control over the manner and means of performing their services. They were, therefore, employees within the statutory purport.

The decision of the Supreme Court in National Labor Relations Board v. Hearst Publications, supra, is not final judicial authority determining that the news vendors here are employees within the Social Security Statutes. The only positive holding in that case is that there was substantial evidence before the National Labor Relations Board to support the legal conclusion of that board establishing the employment relationship within the meaning of the National Labor Relations Act. Nevertheless, the decision here could fairly be made to rest on the results of the case before the Supreme Court. The facts in that case are not identical with those here presented, but their dissimilarity is not in material respects; the statute there interpreted is not the same as those here involved, but they are both of a kind. Although the Supreme Court did not uphold the findings of the National Labor Relations Act on the express basis that they were legally correct, its discourse admits of little doubt that the findings met with the Court's wholehearted approval.[5]

But because that case has the differences pointed out, the present case must be analyzed on its own facts, and the law applied thereto deduced from all competent legal precedents including those announced by the Supreme Court.

The publishers and vendors have, by their contract, attempted to establish a buyer-seller relationship between them. The contracts each recite such to be their intent. But the relationship of buyer and seller between them is entirely unrealistic. The publishers are not engaged in the wholesale business of selling newspapers to retailers, and the news vendors are not in any sense retail merchants in the business of buying and selling merchandise. A newspaper is not, in fact, a commodity bought and sold as merchandise at all. It is the medium of disseminating information; it is the information which is sold and the publishers are the distributors and circulators of this information through the agency of their news vendors. Charging the vendors outright the "wholesale" price of papers delivered to them for sale, is referable more to an intent on the part of the publishers to impose a high degree of responsibility on the vendors for the care of the newspapers so delivered to them and for accuracy in accounting for the proceeds of the sales rather than to an intent to create a bona fide buyer-seller relationship. This is particularly so because as to papers returned unsold, the charge is offset by a corresponding credit. See comment of Judge Denman in this regard in his dissenting opinion in the case of Hearst Publications, Inc., v. National Labor Relations Board, 9 Cir., 136 F.2d 608, reversed, 322 U.S. 111, 64 S.Ct. 851, 88 L.Ed. 1170.

Even the California case of New York Indemnity Co. v. Industrial Accident Comm., 213 Cal. 43, 1 P.2d 12, holding an injured news vendor to be beyond the coverage of the California Workmen's Compensation Act, admitted that news vendors were not independent contractors, but rather in the nature of sales agents.

Much emphasis is placed on the declared intent of the publishers and vendors to establish a buyer-seller relationship and not one of employer and employee. The plaintiffs point out that in the Restatement of the Law of Agency, one of the factors

---

[5] Although it has been said that the same persons might be employees for collective bargaining purposes and not employees within the Social Security laws (Nevin, Inc. v. Rothensies, supra), it hardly seems probable that Congress intended any such legal differentiation.

to be considered is "whether or not the parties believe they are creating the relationship of master and servant." But that belief must be a bona fide belief discernible from their actions and not based on declarations and the formality of contractual arrangements alone. Matcovich v. Anglim, supra; also see Pacific Lumber Co. v. Industrial Acc. Comm., 1943, 22 Cal.2d 410, 139 P.2d 892. Here, nothing that was done functionally indicated a bona fide belief in the creation of a buyer-seller relationship. Furthermore the good faith of the parties' belief seems entirely irrelevant in this case. For it must be remembered that here the employment status of the vendors is important only to determine the applicability of the taxing provisions of the Social Security Statutes. Their applicability is not made to depend on the desires or beliefs of parties. Indeed, their efficacy would soon be impaired if such were the case. A decision in favor of such status for that limited purpose does not infringe upon the parties' right of contract, or deny them the privilege of regarding themselves for any other purpose as buyer and sellers. But however they regard themselves and in whatever degree of good faith, they are nevertheless foreclosed from maintaining their status as buyers and sellers for the purpose of not being employers and employees within the Social Security Statutes if, within the meaning of those statutes the employment relationship is present. Griffiths v. Commissioner, 308 U.S. 355, 358, 60 S.Ct. 277, 84 L.Ed. 319.

The plaintiffs contend there is no employment relationship because "the vendor is free to sell his newspapers in the ways, methods and manner that he may see fit." (Opening statement of plaintiffs' counsel.) That is, even regarding the vendor as an agent, the contention is made that he is nevertheless a free agent—responsible to his principal only for results. At common-law, such a person would not be considered an employee. (Restatement of the Law of Agency). Whether or not this rule is eventually followed in interpreting the employment relationship in Social Security legislation is not of moment. [6] Here there actually was at least a reasonable measure of general control exercised by the publisher over the manner in which the services of the vendors were performed. [7] The publishers selected the vendors, designated their place, days and hours of service (within the limits agreed on by contracts) and fixed the profits they were to derive from the sale of each newspaper (although the profit, once fixed, remained constant for the period of the existing contract.) The vendors were expected to be at their corners at press release time, stay there for the sales period, be able to sell papers and take an interest in selling as many papers as they could. To see that they performed properly, they were kept under the surveillance of the publisher's employee, the "wholesaler." He was authorized to check in the vendor if the latter failed to so perform or to report any such infraction to the publisher, who could then discontinue further sales to the vendor, or report his conduct to the union for discipline by union agents. The vendor was required to sell his papers complete with sections in the order designated by the publisher and to display only newspapers on the stands or racks, which were furnished by the publishers at the latter's expense. The vendor incurred no expense or risks save that of having to pay for papers delivered him which by reason of loss or destruction he was unable to return for credit. The vendors were not allowed to sell competitive newspapers without the publisher's consent. The plaintiffs seek to avoid the

---

[6] In Deecy Products Co. v. Welch, supra [124 F.2d 598], the court said: "* * * Congress does not intend a person to be considered an employee within the meaning of the Act unless he is subject to some sort of control and supervision."

[7] "A reasonable measure of direction and control over method and means of performing the service is a constituent element of the relationship of master and servant as distinguished from that of master and independent contractor, still the direction and control need not relate to every detail." Jones v. Goodson, 10 Cir., 121 F.2d 176, 180.

legal effect of these controls by explaining that they were not controls over the manner and means of performing the services at all (being that of selling newspapers) but merely the imposition of conditions of performance designed to effectuate the accomplishment of the desired results. It is claimed that in every independent contractual service relationship, such conditions are imposed to insure the success of the contract without transforming the relationship into one of employment. The plaintiffs thus invoke the principle that "Where one is performing work in which another is interested the latter may exercise a certain measure of control for a definite and restricted purpose without acquiring the responsibilities of an employer." Los Angeles Athletic Club v. United States, D.C.Cal., 54 F.Supp. 702, 706. This principle was followed in finding against an employment relationship with respect to newsboys in two California cases, Bohanon v. James McClatchy Publishing Co., 16 Cal.App.2d 188, 60 P.2d 510, and New York Indemnity Co. v. Industrial Acc. Comm., 213 Cal. 43, 1 P.2d 12. As to the former case, the employment relationship was there asserted to fix tort liability upon the publisher for the negligence of the newsboy. The court held that although the publisher did exercise some control over the activities of the newsboys, in other respects the latter had a free hand as to how he conducted his route and that in California it is settled "that the control which has been adopted as the test by which the relationship between two persons is to be measured for the purpose of discovering whether such relationship is that of master and servant is complete or unqualified control." [16 Cal.App.2d 188, 60 P.2d 514.] The rule of "complete control" announced in that case has not been followed, even in California, in defining the employment relationship in remedial legislation. Twentieth Century Lites, Inc. v. California Department of Employment, 1946, 28 Cal.2d 56, 168 P.2d 699; Matcovich v. Anglim, 9 Cir., 134 F.2d 834; Grace v. Magruder, App.D.C., 148 F.2d 679. In the case of New York Indemnity

Co. v. Industrial Acc. Comm., supra, it is true that the court rejected the employment relationship within the meaning of the Workmen's Compensation Act in the case of a newsboy operating similarly to the news vendors here. It held that while the newsboy was not an independent contractor, he was nevertheless not an employee since there was lacking that degree of control over the manner and method of performing his duties by the publishers as would establish the employment relationship. Extensive analysis of that case for the purpose of distinguishing it from the present case is unnecessary [8] for several reasons. First, federal courts are not bound by state court decisions in their interpretation of national Social Security legislation. National Labor Relations Board v. Hearst Publications, supra. Second, the decided federal cases indicate clearly a variance from the views there expressed, on the degree of control necessary to make out an employment relationship in remedial legislation. Third, the courts of California themselves have obviously drawn away from the tendency toward the restrictive and narrow application of common-law principles demonstrated by that case. Pacific Employers Insurance Co. v. Industrial Acc. Comm., 3 Cal.2d 759, 47 P.2d 270; Associated Indemnity Corp. v. Industrial Acc. Comm., 1932, 128 Cal.App. 104, 16 P.2d 774. The rule is fairly well settled now that "employment" within the meaning of national remedial legislation, liberally construed, requires no more than a reasonable measure of control over the activities of the employee. What degree of control must be present depends upon the facts of each particular case.

Here, the vendors were subject to the publishers' control in every respect save in the manner in which they personally offered the newspaper for sale to the public and collected the price. As to those features, lack of control is absent because of want of necessity for its presence. The witness, William Parrish, a news vendor, stated that in the sale of newspapers, "it happens there is only one manner to do it." When the manner of performing the

---

[8] For a discussion of the reasons for the reversal by the Cal. Sup. Ct. of its own decision, see note 32 Cal.Law Rev. No. 3, p. 289.

service is beyond another's control because of its nature, absence of direct control over such details becomes insignificant in the overall view of the facts and circumstances to be taken into account in determining the relationship. United States v. Vogue, Inc., 4 Cir., 145 F.2d 609, supra.

Here the news vendors were engaged, as a means of livelihood, in regularly performing personal services constituting an integral part of the business operations of the publishers. In the performance of these services, they were subject to the general control of the publishers in every respect save where control was unimportant. In connection with their services they made no investment of capital, had no expenses and assumed no financial business risks incidental to a separate trade, business or profession. They were, therefore, in employment with respect to which the taxes were properly imposed.

The plaintiffs stress certain pieces of evidence which they claim provide indicia of an independent-contractor relationship, namely, the lack of any right in the publishers to dismiss vendors without cause for the duration of the existing contract, the fact that the vendors provided their own transportation, filed no reports, attended no sales meetings, were not required to report to publishers' premises, have employed substitutes, and were privileged to and some actually sold non-competitive publications and other articles without the publishers' consent. These were at most details of this particular service relationship in operation. They did not alter the essential factors establishing, by their presence, the employment relationship, or change their character in context. National Labor Relations Board v. Hearst Publications, Inc., 322 U.S. 111, 64 S.Ct. 851, 88 L.Ed. 1170; United States v. Wholesale Oil Co., Inc., 10 Cir., 154 F.2d 745; Twentieth Century Lites, Inc., v. California Dept. of Employment, 28 Cal.2d 56, 168 P.2d 699.

■ As to those selling other articles besides newspapers it does not appear that their relationship with the publishers was any different from other news vendors selling newspapers exclusively. The sale by them, therefore, of other articles did not, as to the newsvending, put them in the class of those performing such services incidental to the pursuit of a separately established business involving with respect to those services, capital investment and the assumption of substantial financial risk or the offering of similar services to the public at large.

Judgment will go for defendant in all four cases upon findings of fact and conclusions of law to be presented in accordance with the rules. Federal Rules of Civil Procedure, rule 52, 28 U.S.C.A. following section 723c.