**TOMLIN et al. v. UNITED STATES et al.**
(two cases).

Nos. 23653, 23654.

District Court, N. D. California, S. D.

Dec. 31, 1946.

B. E. Kragen, of San Francisco, Cal., and Lionel B. Benas, of Oakland, Cal., for plaintiffs.

Frank J. Hennessy, U. S. Atty., of San Francisco, Cal., for defendants.

Robert W. Kenny, Atty. Gen., Clarence A. Linn, Deputy Atty. Gen., and Doris H. Maier, Deputy Atty. Gen., amici curiae.

GOODMAN, District Judge.

In those two actions, consolidated for trial, plaintiff, as in Hearst Publications, Inc., v. United States, D.C., 70 F.Supp. 666 and Gensler-Lee, Inc., v. United States, D.C., 70 F.Supp. 675, seeks refund of federal insurance contributions and unemployment taxes upon the ground that certain persons, denominated by plaintiff as "supervisors" and "operators," who performed services in connection with the distribution and operation of plaintiff's so-called "merchandise vending machines" were independent contractors and not employees. Following are the relevant facts:[1]

The plaintiff, hereinafter referred to as "Rex" is a copartnership doing business as Rex Novelty Company. It owns coin-operated so-called merchandise vending machines of the crane or claw type. These machines are valued at approximately $150 each. During the taxable period here involved the firm owned about 450 such machines. The business was started in 1935 by the individuals then comprising the firm. Its operations were conducted in this manner: The machines were placed before the public in various commercial locations, by arrangement with the location owners, com-

---

[1] These actions were submitted for decision upon the transcript of the testimony and evidence taken at the trial in the Superior Court of the State of California, in and for the City and County of San Francisco in Actions No. 316401, 316402, wherein the plaintiffs sought recovery of unemployment taxes paid the State of California.

plete with merchandise and equipped to operate at a profit. They were thereafter regularly serviced and, periodically, emptied of their money contents and redressed. Commencing in 1937, and continuing thereafter throughout the period here involved, the operations above described were also carried on by persons,—not members of the firm,—who were designated by Rex as "Supervisors" and "Operators." It is these men whom plaintiff disclaims as its employees, contending that for the taxable years involved the so-called "Supervisors" were in fact lessees of the plaintiff's machines and that the "Operators" working under them were their (the lessees') employees. In their relationship to Rex, these persons functioned in the following manner:

The Supervisors,—men selected by Rex because of previous experience in the operation of crane machines,— were provided with as many or as few machines as they requested; they were permitted to select some available territory within the state for their operations and were trained by Rex in the business of conducting a route; the Supervisors in turn hired men of their own selection to service and to operate the machines under their directions, and to collect and turn in to them the money returns.

The Supervisors chose the locations in which the machines were to be placed and transferred them from one location to another within the territory when they deemed it proper. They contacted and made all necessary arrangements with the location owners for the placing of the machines in their business establishments and for the latter's remuneration, which was paid out of the machine's gross returns. The Operators' compensation, based on a percentage of the profits, was fixed and paid by the Supervisors. These operators worked under the supervision and control of the supervisors, having no direct contact with Rex. They were, however, required by Rex to obtain a receipt from each location owner showing what money was weekly collected there and the amount paid the location owners. This receipt, together with the balance of the money, they delivered to the supervisor. The supervisor, in turn, delivered the receipt to Rex. The

financial arrangements between the supervisors and Rex varied. The evidence shows, however, that for most of the period in question, these arrangements were for an equal division between them of the net profits of the machines after deduction of the location owner's charges, the cost of the merchandise and such of the other business expenses as were in each particular instance agreed to be paid out of the gross returns. Some operating expenses were borne entirely by Rex (e.g. major repairs to machines); some were absorbed by the Supervisors ( e.g. automobile expenses and wages of operators); and again, some were paid by all parties participating in the profits from the machines. (Federal, State and county licenses.)

Each supervisor submitted weekly reports to Rex (a compilation of his own report and those of his operators) on forms provided by Rex, coincident with the remittance of the week's net collections from each machine in his custody. These composite reports informed Rex of the following facts: The number and location of each machine within the Supervisor's territory; the name of each operator working under the supervisor; such operator's weekly collections from each machine on his route; the commissions paid the location owners out of such collections; the compensation paid the operators; the expenses charged against the gross collections, and such sums as were withheld by the supervisor on account of "supervisor's dr. account or salary." From these reports, Rex made up a weekly cash reconciliation statement settling accounts between Rex and its supervisors.

As to the degree of control asserted by Rex over the activities of the supervisors and operators, these facts appear: Rex never regulated the hours of work of either supervisors or operators. The supervisors had complete charge of the operative details within the territory, including the activities of the operators working under them. However these supervisors were selected by Rex to act as such because of their previous experience in the operation of crane machines and were, furthermore, trained by Rex at the beginning of their service in the business of conducting a route. The man-

ager of Rex made periodical visits to the various territories, discussing business and exchanging views with the supervisors. If any machine was found in need of servicing or repair, the operator would be notified. There is evidence of company meetings called by Rex which supervisors were asked to attend and also to bring their operators with them. (Auditor's Exhibit 5.) Likewise there is proof that supervisors were directed by Rex to return machines not functioning satisfactorily in exchange for machines in good working condition or. to change their location. (Auditor's Exhibit 6.)

In some cases Rex aided the supervisors in getting started by personal or financial assistance. Rex allowed the supervisors to sell their routes, but only to persons satisfactory to Rex.

At sometime during the taxable period and prior to 1940, there came to the attention of one of Rex's partners a form of lease agreement drawn by an out of state attorney and used by others engaged in a similar enterprise. Rex adopted this form agreement and requested its supervisors and operators to execute same. (Copy of this lease agreement is attached to the complaint in each of these actions.) Thereafter substantially all the supervisors and some of the operators executed such agreements.

By the agreement there is purported to be leased certain designated machines (for a stipulated rental based on a percentage of the net proceeds as therein defined) to the so-called "lessee" for an indefinite period of time, the lease being terminable by either party. The lease also contained a provision requiring the lessee to devote his time exclusively to the operation of Rex machines unless otherwise agreed to in writing. It also specified that the agreement should not be construed as creating the legal relationship of partnership, principal and agent, or employer and employee, but should be regarded as one of strict rental only.

Subsequent to the signing of these agreements, the signatory parties continued functioning the same as before. Notwithstanding the terms of the lease, Rex permitted its supervisors to carry on other businesses and the provisions of the lease with respect to the manner of dividing the net profits were not adhered to. When one machine was substituted for another, the change was not noted on the written agreement.

While the facts in this case disclose a greater freedom of action and also, a greater freedom from employer control than in the Gensler-Lee case, supra, this is primarily ascribable to the nature and type of service performed by the supervisors. Although it was the supervisors who hired and paid the operators,—from their agreed percentage of the profits,—and who exercised control over their activities, it is obvious that these were delegated functions and that ultimate control of the operators rested in Rex through the latter's control of the supervisors. Thus, in this case, the servant of the servant was, effectually, the servant of the master. Rex had the right to terminate the supervisors' services at any time, in itself a persuasive indicia of the power of control.[2] As in the Hearst cases, supra, the so-called "lease agreement," indicates an attempt to arbitrarily create a status which in fact was non-existent.

Judgment will go for defendant in both cases upon findings of fact and conclusions of law to be presented in accordance with the Rules. Federal Rules of Civil Procedure, rule 52, 28 U.S.C.A. following section 723c.

---

[2] While this cause was under submission, the District Court of Appeal of California reversed the lower court's decision in Actions No. 316401 and 316402, (see Footnote 1) holding against an employee status. However I am unable to follow this decision for the reason that the court apparently rests its decision upon Briggs v. California Employment Comm., 28 Cal.2d ——, 168 P.2d 696, wherein there was absent any right of control or of discharge of the employee. It further appears that on December 19, 1946 petition for a hearing by the California Supreme Court was granted in these actions.