**TAPAGER v. BIRMINGHAM (two cases).**

Civil Actions Nos. 284, 375.

District Court, N. D. Iowa,
Central Division.

Jan. 16, 1948.

Leslie L. Boomhower, of Mason City, Iowa, for plaintiff.

T. E. Diamond, U. S. Dist. Atty., and Wm. B. Danforth, Asst. U. S. Dist. Atty., both of Sioux City, Iowa, and Ruppert Bingham, Sp. Asst. to Atty. Gen., for defendant.

GRAVEN, District Judge.

Cases involving the question of whether certain salesmen and salesman-collectors, whose sales activities consisted of selling household furnishings, had the status of employees under the Social Security Act and the Federal Unemployment Tax Act. These two actions which were consolidated for the purpose of trial were brought by R. W. Tapager as a taxpayer for the recovery of and relief from collection of taxes, penalties, and interest assessed on him by the defendant, E. H. Birmingham, Collector of Internal Revenue for the District of Iowa. The taxes were assessed under Title IX of the Social Security Act, as amended, relating to taxes on employers of eight or more, and under the Federal Unemployment Tax Act. 42 U.S.C.A. § 1101, 26 U.S.C.A. Int.Rev.Code, § 1600.

The plaintiff paid under protest the amount of such taxes for the years of 1936, 1937, 1938, and 1939, and filed claims for refund therefor. The Collector has been and is asserting that the plaintiff owes such taxes for the years of 1941, 1942, and 1943, and has been proceeding to enforce the collection of them. In Civil No. 284, the plaintiff seeks to recover the amount of the taxes paid under protest for the year of 1936. In that same action the plaintiff asks that the Collector be enjoined from collecting or attempting to collect the claimed taxes for the years of 1941, 1942, and 1943. In Civil No. 375, the plaintiff seeks to recover the taxes paid under protest for the years of 1937, 1938, and 1939.

The plaintiff is a resident of Mason City, Cerro Gordo County, Iowa. He is now and, for a number of years, has been engaged in the household furnishing business under the trade name of R. W. Tapager & Company. At various times during the tax periods involved, the plaintiff maintained stores at Mason City, Iowa, Marshalltown, Iowa, Waterloo, Iowa, Cedar Rapids, Iowa, Muscatine, Iowa, Austin, Minnesota, and Rock Island, Illinois. In 1943, the last tax period in question, he maintained stores only at Cedar Rapids, Waterloo, and Mason City, Iowa. During the tax periods in question, the plaintiff was engaged in the sales distribution of curtains, silverware, linoleum, and related household furnishings purchased by him. The plaintiff, in connection with his business operations, employed bookkeepers, auditors, and managers whose status as employees under the Social Security Act is not here in controversy. The plaintiff employed some persons who sold goods in the plaintiff's stores and who were paid salaries. The status of those employees under the Social Security Act is not here in controversy. The controversy in these cases is over the status under the Social Security Act of those whose activities in the plaintiff's business distinguished them as salesmen and salesman-collectors.

The number of the plaintiff's employees during the tax period in question, aside from those whose status is in question, has always been below eight. If those whose status is in question did not have the status of employees under the Social Security Act, then the plaintiff was not subject to the taxes herein involved. If, however, they did have the status of employees, then the plaintiff was subject to the taxes involved.

The first group whose status is in controversy consisted of those referred to as salesmen. The salesmen worked either full or part time. They were not allowed to sell in the stores maintained by the plaintiff. They sold goods furnished to them by the plaintiff, to customers who were contracted in their homes, and other places. The goods were either sold outright for cash or were placed with a customer under a rental agreement by which the customer could, through the payment of rent, acquire ownership of the goods. The price at which the goods could be sold or rented was fixed by the plaintiff. The plaintiff checked goods out of his stores to the salesmen for use as samples, for sale, or for placing with a customer under rental agreements. In all cases when goods were checked out to a salesman, he signed an agreement that the goods were held by him as a bailee in trust, and that, except as bailee, he had "no interest, title, or ownership in said goods." Under that agreement a salesman either had to return the goods or the minimum agreed price thereof, or a contract for their sale or rental. The salesmen were paid on a commission basis of ten per cent or twenty per cent of the price of the goods sold, varying according to the different kinds of goods involved. Salesmen received commissions both on outright sales and on goods placed with a customer under a rental agreement. Where goods were sold outright, the salesmen retained their commission from the purchase price and turned in the balance to the plaintiff. Where goods were placed with a customer under a rental agreement, the salesmen generally retained their commission from the down payment. In cases where the amount of the down payment was insufficient to cover the commission due, the salesmen could draw upon the plaintiff for the balance of the commission. In such cases the salesmen signed an I.O.U. to the plaintiff. The I.O.U. would be cancelled when the plaintiff received sufficient payments from the customer to equal the commission. Where goods were placed with a customer under a rental agreement by a salesman, the salesman was not authorized to collect any payments except the down payment.

The second group whose status is in controversy consisted of those referred to as salesman-collectors. The salesman-collectors sold goods in the same manner as the salesmen. Such salesman-collectors had the additional duties of collecting the rentals due under the rental agreements turned in by the salesmen and of repossessing goods where there was a default in rental payments. Such salesman-collectors, in addition to receiving the commissions paid to salesmen, also received commissions on collections of rental payments. In a few instances such salesman-collectors were placed on a salary or given a guaranteed drawing account. Under the drawing account arrangement, the salesman-collectors were guaranteed a weekly minimum amount. If the commission of such salesman-collectors did not come up to the minimum, they would give the plaintiff an I.O.U. for the difference. Such salesman-collectors were expected to make up the difference by future commissions. The turnover of the sales force was generally high, with only a small number of sales personnel remaining in the work for any long period of time. No particular hours were prescribed by the plaintiff for either part time or full time work. Many of the sales force owned automobiles which they used in connection with their work, personally paying the cost and expense of their operation. The plaintiff had liability insurance written upon such automobiles. Those policies ran in favor of the plaintiff and the owner of the automobile. The plaintiff in the first instance paid the premiums on such policies, but was eventually reimbursed therefor by the owners of the automobiles. It does not appear that it was a requirement of the plaintiff that the salesmen own or have the use of an automobile.

The area in which the members of the sales force were permitted to sell was for all practical purposes unrestricted. The area covered by a salesman-collector was necessarily governed somewhat by the areas covered by the salesmen whose transactions gave rise to collections. The members of the sales force were given no orders or lists of prospective customers, and generally no particular area was mapped out for

them to cover. The plaintiff could at any time demand back his goods from any member of the sales force and terminate relations with him. The plaintiff testified that grounds for terminating the relationship were embezzlement, dishonesty, drunkenness, laziness, or the committing of a misdemeanor. The members of the sales force were expected to report at a particular store of the plaintiff once a week as to their recent sales and rental agreements. While there existed a general understanding that they were to report once a week, where the members of the sales force had no duties except selling, the time for reporting often varied with the amount and extent of their sales activities. The salesman-collectors were required to turn in their collections once a week, at which time they would be paid their commissions. In cases of default under rental agreements, repossessions were made of the goods involved, either by the salesman-collectors or by the store managers acting either on their own volition or on orders from the plaintiff. The functions performed by the salesmen and salesman-collectors were of great importance in the sales distribution of the goods handled by the plaintiff, and the activities of the salesmen and salesman-collectors were closely integrated into the plaintiff's business.

The Social Security Act was originally enacted in 1935. Title IX of that Act imposed taxes on employers of eight or more. In 1939 the provisions of the Social Security Act relating to such taxes were coordinated into the Internal Revenue Code and now appear in Subchapter C, Title 26, U.S.C.A. Int. Rev. Code. The provisions of that Subchapter relating to such taxes are known as the Federal Unemployment Tax Act.

Under the Social Security Act and the Federal Unemployment Tax Act, it is provided that a taxpayer may credit against the taxes imposed by those acts payments made by him into a state unemployment fund up to ninety per cent of the taxes. The State of Iowa has made provision for a state unemployment fund which is administered by the Iowa Employment Security Commission, Chapter 96, Code of Iowa 1946. The Iowa Employment Commission ruled on November 22, 1944, that the same persons whose status is in question in the present case were independent contractors under the Iowa Act, and the plaintiff stresses that ruling. The evident basis for that ruling is indicated in the case of Meredith Pub. Co. v. Iowa Employment Security Commission, 1942, 232 Iowa 666, 6 N.W.2d 6, 13. In that case the Iowa Court points out that the overwhelming number of state unemployment acts require three standards to be met by one performing services for another in order for those services to be classified as those rendered by an independent contractor. Those three standards are:

"(A) Such individual has been and will continue to be free from control or direction over the performance of such services, both under his contract of service and in fact; and

"(B) Such service is either outside the usual course of the business for which such service is performed or that such service is performed outside of all the places of business of the enterprise for which such service is performed; and

"(C) Such individual is engaged in an independently established trade, occupation, profession or business."

The Iowa Court further points out (232 Iowa at page 679, 6 N.W.2d at page 13) that the Iowa Act only requires a person to meet paragraph (A) in order for his services to be classified as those of an independent contractor, and that the Iowa Act does not contain paragraphs (B) and (C). Where a state unemployment act contains the additional paragraphs (B) and (C), the evident object of such additional paragraphs is to reduce the number of situations in which the services rendered would be classified as those of an independent contractor. It was the thought of the Iowa Court (232 Iowa at page 679, 6 N.W.2d at page 13, 14) that the addition of paragraphs (B) and (C) to a state act would have the effect of giving the statute a broader coverage than the Federal Social Security Act. In the proceedings before the Iowa Employment Security Commission relating to the status of the members of the plaintiff's sales force under the Iowa

Act, the plaintiff was only required to establish what is contained in paragraph (A) in order to have them classified as independent contractors.

While the state unemployment acts and the Federal Social Security Act are intercoordinated in their operation, they are the enactments of separate and distinct legislative bodies, and the interpretations of the provisions of state unemployment acts by state commissions and rulings made by such commissions as to the coverage of such acts are not binding upon federal courts in passing upon questions arising under the Federal Social Security Act. American Oil Co. v. Fly, 5th Cir., 1943, 135 F.2d 491, 147 A.L.R. 824; Beaverdale Memorial Park v. United States, D.C. Conn., 1942, 47 F.Supp. 663. In the case of National Labor Relations Board v. Hearst, 322 U.S. 111, at page 123, 64 S.Ct. 851, at pages 856, 857, 88 L.Ed. 1170, the United States Supreme Court points out the chaotic results which would follow should the application of a federal legislative enactment be made dependent upon state law for interpretation.

In 42 U.S.C.A. § 1101 of the Social Security Act, it was provided in part as follows:

"On and after January 1, 1936, every employer (as defined in section 1107 of this title) shall pay for each calendar year an excise tax, with respect to having individuals in his employ, equal to the following percentages of the total wages (as defined in section 1107 of this title) payable by him (regardless of the time of payment) with respect to employment (as defined in section 1107 of this chapter) during such calendar year: * * *."

In 42 U.S.C.A. § 1107 it was provided in part as follows:

"Definitions. When used in sections 1101-1110 of this title—

"(a) The term 'employer' does not include any person unless on each of some twenty days during the taxable year, each day being in a different calendar week, the total number of individuals who were in his employ for some portion of the day (whether or not at the same moment of time) was eight or more.

"(b) The term 'wages' means all remuneration for employment, including the cash value of all remuneration paid in any medium other than cash.

"(c) The term 'employment' means any service, of whatever nature, performed within the United States by an employee for his employer, except—* * *."

There is then set forth in that section of the statute a list of specific different kinds of service and labor excepted from the Act. None of those specific exceptions is here in question.

26 U.S.C.A. Int.Rev.Code, § 1607 of the Federal Unemployment Tax Act, as amended August 10, 1939, provided in part as follows:

"(c) Employment. The term 'employment' means any service performed prior to January 1, 1940, which was employment as defined in this section prior to such date, and any service, of whatever nature, performed after December 31, 1939, within the United States by an employee for the person employing him, * * *."

On August 10, 1946, the Federal Employment Tax Act was further amended. 26 U.S.C.A.Int.Rev.Code, § 1607 of that act now reads in part as follows:

"(c) Employment. The term 'employment' means any service performed prior to July 1, 1946, which was employment as defined in this section as in effect at the time the service was performed; and any service, of whatever nature, performed after June 30, 1946, by an employee for the person employing him, * * *."

Congress has increased the list of specific kinds of service and labor excepted. It is of interest to note that 26 U.S.C.A. Int.Rev.Code, § 1607(c) (14) and (15) now provide as follows:

"(14) Service performed by an individual for a person as an insurance agent or as an insurance solicitor, if all such service performed by such individual for such person is performed for remuneration solely by way of commission; (15) Service performed by an individual under the age of eighteen in the delivery or distribution of newspapers or shopping news, not including delivery or distribution to any point for subsequent delivery or distribution;"

For convenience, the Social Security Act and the amendments to it and the Federal Unemployment Tax Act and the amendments to it will be referred to as the Social Security Act, and the taxes provided for in those Acts will be referred to as Social Security taxes.

■ The Social Security Act does not specifically define an employee. Social Security Board v. Nierotko, 1946, 327 U.S. 358, 363, 66 S.Ct. 637, 162 A.L.R. 1445, 90 L.Ed. 718. The definitions contained in the Act relating to employment are very general, while the provisions in the Act relating to exemptions are very specific in character. In regard to these characteristics, the United States Supreme Court in the case of United States v. Silk, 1947, 331 U.S. 704, at pages 711, 712, 67 S.Ct. 1463, at page 1467, 91 L.Ed. ——, states:

"The very specificity of the exemptions, however, and the generality of the employment definitions indicates that the terms 'employment' and 'employee,' are to be construed to accomplish the purposes of the legislation. As the federal social security legislation is an attack on recognized evils in our national economy, a constricted interpretation of the phrasing by the courts would not comport with its purpose. * * *"

There is nothing in the legislative history of the Social Security Act that is of assistance in determining the question of the existence of the employer-employee relation under the Act. United States v. Silk, 1947, 331 U.S. 704, 711, 67 S.Ct. 1463, 91 L. Ed. ——.

The Commissioner of Internal Revenue with the approval of the Secretary of Treasury promulgated regulations having to do with the employer-employee relationship under the Social Security Act. The case of Birmingham v. Bartels, 8 Cir., 1946 157 F.2d 295, at pages 298, 299, reversed 332 U.S. 126, 67 S.Ct. 1547, 91 L.Ed. ——, sets forth the regulations and makes the following statement in regard to them:

"The Regulations defining employer-employee relationship for social-security-tax purposes, Treasury Regulations 106, § 402.204, Treasury Regulations 107, § 403.-204, promulgated under the authority of 26 U.S.C.A.Int.Rev.Code, §§ 1429, 1609, provide: 'Every individual is an employee if the relationship between him and the person for whom he performs services is the legal relationship of employer and employee. Generally such relationship exists when the person for whom services are performed has the right to control and direct the individual who performs the services, not only as to the result to be accomplished by the work but also as to the details and means by which that result is accomplished That is, an employee is subject to the will and control of the employer not only as to what shall be done but how it shall be done. In this connection, it is not necessary that the employer actually direct or control the manner in which the services are performed; it is sufficient if he has the right to do so. The right to discharge is also an important factor indicating that the person possessing that right is an employer. Other factors characteristic of an employer, but not necessarily present in every case, are the furnishing of tools and the furnishing of a place to work, to the individual who performs the services. In general, if an individual is subject to the control or direction of another merely as to the result to be accomplished by the work and not as to the means and methods for accomplishing the result, he is an independent contractor. An individual performing services as an independent contractor is not as to such services an employee. Generally, physicians, lawyers, dentists, veterinarians, contractors, subcontractors, public stenographers, auctioneers, and others who follow an independent trade, business, or profession, in which they offer their services to the public, are independent contractors and not employees. Whether the relationship of employer and employee exists will in doubtful cases be determined upon an examination of the particular facts of each case. If the relationship of employer and employee exists, the designation or description of the relationship by the parties as anything other than that of employer and employee is immaterial. Thus, if such relationship exists, it is of no consequence that the employee is designated as a partner, co-adventurer, agent, or independent contractor. * * *'

"The Regulations have merely reiterated definitions and tests of the common law for determining master-and-servant and independent-contractor relationships in vicarious tort-liability. Cf. Singer Manufacturing Co. v. Rahn, 132 U.S. 518, 523, 10 S.Ct. 175, 33 L.Ed. 440; Casement v. Brown, 148 U.S. 615, 622, 13 S.Ct. 672, 37 L.Ed. 582; Restatement, Agency, § 220. * * *"

In the case of National Labor Relations Board v. Hearst Publications, Inc., 1944, 322 U.S. 111, 64 S.Ct. 851, 88 L.Ed. 1170, there came before the Supreme Court the question of whether certain newspaper vendors were employees within the provision of the National Labor Relations Act. 29 U.S.C.A. §§ 151–166. In that case it was held that the evidence was sufficient to support a finding of the National Labor Relations Board to the effect that such newspaper vendors were employees under the National Labor Relations Act. In that case the Court states (322 U.S. at pages 120, 121, 64 S.Ct. at pages 855, 856, 88 L.Ed. 1170):

"The principal question is whether the newsboys are 'employees.' Because Congress did not explicitly define the term, respondents say its meaning must be determined by reference to common-law standards. In their view 'common-law standards' are those the courts have applied in distinguishing between 'employees' and 'independent contractors' when working out various problems unrelated to the Wagner Act's purposes and provisions.

"The argument assumes that there is some simple, uniform and easily applicable test which the courts have used, in dealing with such problems, to determine whether persons doing work for others fall in one class or the other. Unfortunately this is not true. Only by a long and tortuous history was the simple formulation worked out which has been stated most frequently as 'the test' for deciding whether one who hires another is responsible in tort for his wrongdoing. But this formula has been by no means exclusively controlling in the solution of other problems. And its simplicity has been illusory because it is more largely simplicity of formulation than of application. Few problems in the law have given greater variety of application and conflict in results than the cases arising in the borderland between what is clearly an employer-employee relationship and what is clearly one of independent entrepreneurial dealing. This is true within the limited field of determining vicarious liability in tort. It becomes more so when the field is expended to include all of the possible applications of the distinctiton."

In the same case, the same Court states (322 U.S. at page 129, 64 S.Ct. at page 859, 88 L.Ed. 1170):

"In this light, the broad language of the Act's definitions, which in terms reject conventional limitations on such conceptions as 'employee,' 'employer,' and 'labor dispute,' leaves no doubt that its applicability is to be determined broadly, in doubtful situations, by underlying economic facts rather than technically and exclusively by previously established legal classifications. * * *"

The Court goes on to state (322 U.S. at page 129, 64 S.Ct. at page 859, 88 L.Ed. 1170) that technical concepts pertinent to an employer's legal responsibility to third persons for acts of his servants were to be rejected in determining the existence of an employer-employee relationship under the National Labor Relations Act. After the decision in the case of National Labor Relations Board v. Hearst Publications, supra, there was uncertainty both as to the extent to which the common law concepts of employment had been rejected and as to whether such rejection was to be extended into employment determinations of the Social Security Act.

Following the decision by the United States Supreme Court in the case of National Labor Relations Board v. Hearst Publications, supra, the Hearst Publications brought suit to recover the Social Security taxes paid for the same newspaper vendors. Hearst Publications v. United States, D.C.Cal., 1946, 70 F.Supp. 666. The Court in this latter case held that such vendors were employees under the Social Security Act. The Court held that the term "employment" in the Social Security Act was to be interpreted (70 F.Supp. at page 670): " * * * in a realistically practical sense, according to established common law doctrines; in favor, however, of the

employment relationship in doubtful cases, because of the remedial nature of the statutory objectives." The Court in that case referred to the claims made by the Government as to the effect of the decision in the case of National Labor Relations Board v. Hears Publications, supra. See also Gensler–Lee, Inc., v. United States, D.C. Cal., 1946, 70 F.Supp. 675.

On June 16, 1947, the United States Supreme Court handed down its decision in the cases of United States v. Silk, and Harrison, Collector v. Greyvan, Inc. Those cases had to do with employer-employee relationship under the Social Security Act. One opinion covered the two cases, 331 U. S. 704, 67 S.Ct. 1463, 91 L.Ed. ——. In that opinion the Court, after discussing the rules held to be applicable in the case of National Labor Relations Board v. Hearst Publications, supra, states (331 U.S. at pages 713, 714, 67 S.Ct. at page 1468) : "Application of the social security legislation should follow the same rule that we applied to the National Labor Relations Act in the Hearst case."

In the case of United States v. Silk, supra, there were two groups whose status was in controversy. In the case of Harrison, Collector, v. Greyvan, Inc., supra, there was one group whose status was in controversy. The question in each case was whether those constituting the different groups were employees or independent contractors under the Social Security Act. In the Silk case, the taxpayer sold coal at retail in the City of Topeka, Kansas. His coal yard consisted of one building for an office, one building for a gathering place for workers, railroad tracks upon which carloads of coal were placed for unloading, and bins into which the coal could be unloaded. The coal was unloaded by men known as unloaders who furnished their own tools. The taxpayer paid them an agreed price per ton to unload coal from the railroad cars. The unloaders would come to the yard when they pleased or wished. They worked for others at will. Some of the unloaders worked fairly regularly; others were "floaters" who came to the yard only intermittently. . The Court held that the unloaders were employees under the Social Security Act, stating in regard to them (331 U.S. at page 717, 67 S.Ct. at page 1470) :

"They provided only picks and shovels. They had no opportunity to gain or lose except from the work of their hands and these simple tools. That the unloaders did not work regularly is not significant. They did work in the course of the employer's trade or business. This brings them under the coverage of the Act. They are of the group that the Social Security Act was intended to aid. Silk was in a position to exercise all necessary supervision over their simple tasks. Unloaders have often been held to be employees in tort cases."

In the Silk case the other group whose status was in controversy were those referred to as driver-owners. The taxpayer in that case owned no trucks himself. He made arrangements with workers who owned their own trucks to deliver coal at a uniform price per ton which was paid to the driver-owner out of the price received by the taxpayer from the customer for the coal. The driver-owners paid all the operating expenses of their trucks and for extra help needed in connection with delivering coal. Any damage caused by the driver-owners was paid by the taxpayer. The driver-owners could come and go as they pleased. They hauled for others when they pleased. No record was kept of their time. They were paid after each trip, at the end of the day, or at the end of the week as they requested. In the case of Harrison, Collector v. Greyvan, Inc., supra, the taxpayer was engaged in the interstate shipment of freight by truck. The taxpayer entered into contracts with owners of trucks under which they were to haul freight exclusively for the taxpayer. Such owners operated their trucks at their own expense. They paid their own assistants. They received as remuneration for the freight hauled by them for the taxpayer a portion of the charges paid to the taxpayer therefor by the shippers.

The United States Supreme Court held that the driver-owners in both the Silk and the Greyvan cases were independent contractors. That Court stated (331 U.S. at page 719, 67 S.Ct. at page 1471) :

"* * * But we agree with the decisions below in Silk and Greyvan that

where the arrangements leave the driver-owners so much responsibility for investment and management as here, they must be held to be independent contractors. These driver-owners are small businessmen. They own their own trucks. They hire their own helpers. In one instance they haul for a single business, in the other for any customer. The distinction, though important, is not controlling. It is the total situation, including the risk undertaken, the control exercised, the opportunity for profit from sound management, that marks these driver-owners as independent contractors."

In the Bartels-Birmingham litigation there was involved the question of the liability of ballroom operators for Social Security taxes for the members of dance orchestras playing at their ballrooms. The operators had signed contracts which stated that such members were the employees of the operators and that the operators were to have complete control of them. The ballroom operators paid Social Security taxes on them as their employees. They then sought to recover such taxes. The trial court in the case of Bartels v. Birmingham, D.C.Iowa, 1945, 59 F.Supp. 84, held that the orchestra members were not employees of the ballroom operators, but were the employees of their band leaders and that the relationship of the band leaders to the operators was that of independent contractors. The Eighth Circuit Court of Appeals in Birmingham v. Bartels, 1947, 157 F.2d 295, reversed the decision of the trial court. That court held that the ballroom operators were liable for the Social Security taxes for the members of the dance orchestras. That court considered the power of control a predominating factor. It held that one was an employer under the Social Security Act if he had the right to direct what should be done and how it should be done whether or not such control was actually exercised. The United States Supreme Court reversed the decision of the Circuit Court of Appeals in Bartels v. Birmingham, 1947, 332 U.S. 126, 67 S.Ct. 1547, 91 L.Ed. ——. It was held that the orchestra members were not employees of the ballroom operators under the Social Security Act, and rejected

the power of control test as being a dominant consideration.

The policies and standards to be applied in determining employment under the Social Security Act are those stated or indicated by the United States Supreme Court in the cases of National Labor Relations Board v. Hearst Publications, supra; United States v. Silk, supra; Harrison, Collector, v. Greyvan, Inc., supra; and Bartels v. Birmingham, supra. The Supreme Court in the last cited case states (332 U.S. at page 130, 67 S.Ct. at page 1549):

"In United States v. Silk, supra, we held that the relationship of employer-employee, which determines the liability for employment taxes under the Social Security Act was not to be determined solely by the idea of control which an alleged employer may or could exercise over the details of the service rendered to his business by the worker or workers. Obviously control is characteristically associated with the employer-employee relationship, but in the application of social legislation employees are those who as a matter of economic reality are dependent upon the business to which they render service. In Silk, we pointed out that permanency of the relation, the skill required, the investment in the facilities for work and opportunities for profit or loss from the activities were also factors that should enter into judicial determination as to the coverage of the Social Security Act. It is the total situation that controls. * * *"

It is next necessary to apply the tests and standards stated or indicated by the United States Supreme Court in the cases of United States v. Silk, supra; Harrison, Collector, v. Greyvan, Inc., supra; and Bartels v. Birmingham, supra, to the situation in the present case. Those factors are the degree of control exercised by the alleged employer, the permanency of the relation, the skill required, the investment in facilities for the work, and the opportunity of profit and loss from the activities. The foregoing is not a complete list, nor is the absence or presence of any of the factors listed controlling over the total situation.

The "degree of control" factor fits into the total scheme of the "economic reality" test, as one tending, as the degree of the right to control over one rendering service to another becomes higher, to establish that the one performing that service is an employee, and, conversely, as the degree of control becomes less, tending to establish the individual's status as an independent contractor. The "degree of control" test has been and still is of great importance in determining the question of the liability of one person for the tortious acts of another. At earlier common law there was great reluctance on the part of the courts to hold one person liable for the tortious acts of another. The question arose most frequently in cases where one person sought to hold another liable for a third person's tort because of a claimed employer-employee, or, technically, a master-servant relation. The development of the "fellow-servant" and "frolic" doctrines are indicative of the early reluctance of the courts to hold one party liable for the torts of another.

The importance of the power of control in the establishment of tort liability of an employer is based upon the fact that the employee is generally obliged as a matter of economic expediency to follow the instructions of his employer as to the negligent or prudent manner in which he carries on activities in the course of his employment, even though in fact the employee may not be subject to actual physical control. In theory, at least, this situation gives birth to a sound basis for employer liability, and the presence or absence of the power of control is generally of paramount importance in the establishing of that liability.

In the present case the members of the plaintiff's sales force were free from detailed control in the method of their performing the selling function. This was largely because of the fact that their selling work was specifically arranged by the plaintiff to be done at places away from the plaintiff's stores and at times convenient to the salesmen. The method of remuneration of the sales force by straight commission also made it unnecessary for the plaintiff or his managers to keep a close check upon the method of carrying on the selling work. This latitude in the method or techniques of selling was not such as by itself to constitute the sales force a group of independent contractors for purposes of the social legislation here considered.

The only items of equipment needed by the sales force in making sales were samples of the plaintiff's goods or selections therefrom for display to prospective customers. Such items were furnished by the plaintiff under a contract of bailment. The plaintiff generally allowed the members of his sales force considerable latitude in the matter of time for carrying on their selling activities. The plaintiff secured many members of his sales force who, because of other occupations, could devote only certain hours to selling work. The latitude in the matter of time for selling was allowed by the plaintiff to meet their varying situations. The plaintiff could have, had he so desired, imposed more definite hours upon the members of his sales force, and at times did so. The fact that the control exercised by the plaintiff was somewhat loose in character did not negative the right and power of the plaintiff to exercise stricter control. No salesman or salesman-collector had authority to change the price of an article set by the plaintiff, nor could he change the set terms of payments on a rental agreement. It seems apparent that the sales activities of the members of the sales force were to be carried on by such members personally and not by means of subsalesmen or assistants hired by them. It seems clear that the plaintiff had the power to change the amount of commission allowed the members of his sales force on future sales or to change the method of remuneration for such salesmen without breaching any existent contract or agreement with them.

One of the significant factors in the matter of control is the right or power of the person for whom the services of employment are rendered to terminate the relationship without cause or on short notice. In the present case the plaintiff testified that he could and did discharge mem-

bers of his sales force for embezzlement, dishonesty, laziness, or for commission of a misdemeanor. These grounds for dismissal were no part of any existent contract between him and the members of his sales force. The grounds for the termination of the relationship easily could have been enlarged by the plaintiff to include any other behavior on the part of such members of the sales force of which he disapproved or the relationship terminated by him without cause without breaching any existent contract or agreement with such members. During the periods here involved, numerous members of the sales force quit their jobs and some were discharged. Apparently the salesmen's quitting or their discharge was never considered as constituting a breach of any existent contract or agreement. In the bailment contract signed by each salesman on taking out goods for sample or sale, it was provided that the plaintiff or his store managers could require the surrender of those goods on demand. This was a power to deprive a salesman totally or substantially of a necessary aid to selling activity without the plaintiff being in breach of any obligation to the salesman so deprived. Such a situation as viewed from the entire circumstances would seem to be incompatible with the freedom of control enjoyed by an independent contractor.

■ The factor "permanency of relation" is a component to be considered in the entire situation as tending to establish as a matter of economic reality the dependence of the one performing the services upon the business of the one for whom the services are performed, while impermanency of relation tends to establish his independence. The relationship of an independent contractor generally contemplates the obtaining of an agreed end and usually contemplates the obtaining of that end within a stipulated period of time. The relationship of employment generally contemplates a continuous and indefinite rendering of services which relationship is terminable either at the option of the employer or the employee without contractual liability. The continuing dependency of the one rendering services to the one for whom the services are rendered is of im-

portance in connection with the factor of "permanency of relation." Thus, an element of definiteness as to the time of the termination of the relationship gives rise to an inference of impermanency and independence, while indefiniteness as to the time of termination gives rise to an inference of permanency. The fact that the services are rendered by part time work does not rebut the inference of permanency so long as the services rendered are reasonably and regularly recurrent.

There was a high turnover in the plaintiff's sales force during the periods in question. This condition was not one of the plaintiff's own choosing, but was rather an inherent characteristic of the outside selling methods used by the plaintiff. The plaintiff desired as continuous and as active a sales service from his sales force as he could obtain. The fact that many of the salesmen were also engaged in other work and performed only part time service for him would not as a matter of economic reality negative the fact that during the perhaps short but continuing and recurring periods of service to him these part time salesmen were dependent upon his business. As a matter of economic reality those who worked for the plaintiff in a full time capacity were unquestionably dependent upon his business by the permanency of their relation as employees.

■ The factor of skill required of the individual performing the services is frequently of importance in regard to the question of an independent contractor or employee status. The greater the skill required to perform a given function, the less practical likelihood there will be that the individual for whom the skilled service is performed will be able to control the individual performing the function as to the means by which it is done, and the greater will be the tendency to find that the individual from his possession of tools, equipment, or knowledge used in the skilled operation will be engaged in an independent business. This is, of course, not a universal situation. Many types of employment exist which involve the highest type of skill on the part of a person rendering a service in an employee capacity. The factor of skill must, as must all the

other factors, be examined with a view to all other facts and circumstances of the particular case.

In the present case it does not seem that the selling service performed by the sales force required any specialized training or particular skill. Many of the plaintiff's salesmen sold in their spare time after working another job and apparently possessed no special qualifications for a selling position. It seems that the plaintiff did not find it necessary to give the members of his sales force any course of instruction in selling or in the selling technique to be followed. It is evident that the type of goods sold and distributed by the plaintiff were not such as to require a special skill in demonstration or operation. The forms to be filled out by the members of the sales force in connection with rental agreements were simple in character and easily completed. As a matter of economic reality, it cannot be said that any skill shown to be possessed by the members of the plaintiff's sales force was such as to tend to establish them in a status independent of the plaintiff's business, or engaged in any business of their own.

■ A substantial investment in the facilities used by one in performing services for another is indicative that the one performing the services is engaged in an independent business and is not the employee of the one for whom the services are performed. Such investment is frequently represented by ownership of or an interest in an establishment or in equipment distinct from and unrelated directly to the business of the person for whom the services are rendered. Where a person has a substantial investment in the facilities used in rendering some service, the tendency is toward the finding that such a person has assumed the status of an independent contractor and away from the finding that that person has integrated his investment solely into the business of those for whom he renders service.

In the present case no substantial investment was made by the salesmen in the facilities used in the selling operation. They generally used their own automobiles. However, it appears that usually they had automobiles before becoming members of the plaintiff's sales force, and that their automobiles were used by them for personal pleasure purposes as well as for other work. The facilities used by the salesmen in connection with their selling activity consisted largely of samples and goods which were furnished entirely by the plaintiff. The salesmen had only custody of such items by and with the consent of the plaintiff and until sold they were recoverable by him on demand. The plaintiff's business was selling household furnishings acquired by him. The salesmen performed that exact function—selling household furnishings acquired by the plaintiff. Their selling activity was fully and completely integrated into the plaintiff's business. It would seem as a matter of economic reality that the sales force did not have such an investment in unintegrated facilities as would warrant the inference that they were independent contractors under the Social Security Act.

■ The opportunity for profit or loss by a person rendering a service is indicative of the investment of capital by such a person in a business of his own. A situation in which a person may, through remuneration on a commission or piece-work basis, have an opportunity for increased or decreased earnings is not necessarily indicative of an opportunity for profit or loss through investment. Under a commission or piece-work arrangement of compensation, no risk of personal investment need be involved. Where a person has no investment involved, he is not affected by the factor of risk of profit or loss from his decisions in the continuous or recurrent rendering of a service as he would were he operating an independent business. In general, the decisions made in the ordinary course of activity by those having an employment status do not involve a personal risk of profit or loss.

In the present case the members of the sales force had no capital investment in the business carried on by them. Any decisions made by them in the ordinary course of business did not carry with them a risk of personal profit or loss. The salesmen at no time had title to any of the goods sold and

the commissions earned by them on rental agreements were not affected by subsequent defaults by a customer buying merchandise in that manner. The members of the sales force were not operating a multitude of small independent businesses in selling household furnishings. They were operating one business. That business was the plaintiff's business of merchandising household furnishings. As a matter of economic reality, the operations of the sales force were not such as to involve at any time as to them an "opportunity for profit or loss" in the sense intended by the United States Supreme Court in specifying that factor as one for consideration in the establishment or nonestablishment of the employment status.

It is believed that in the light of the decisions of the United States Supreme Court in the cases of United States v. Silk, supra, Harrison, Collector, v. Greyvan, Inc., supra, and Bartels v. Birmingham, supra, that from an analysis of the total factual situation the salesmen and salesman-collectors involved in the present case had the status of employees under the Social Security Act during the periods in question.

 The factors referred to by the Supreme Court in the cases of United States v. Silk, supra, Harrison, Collector, v. Greyvan, Inc., supra, and Bartels v. Birmingham, supra, are not new to the law. All of them have been noted at some time or other in cases in the general field of law having to do with the legal responsibility of one person for the actions of another. In such cases, the factor of control is given primary and paramount consideration and less consideration is given to and less emphasis is placed upon the other factors referred to by the United States Supreme Court in the cases just cited. It would seem that from the decisions of the Supreme Court in the cases just cited certain conclusions may be drawn in regard to the question of coverage under the Social Security Act. Some of those conclusions are:

1. That it is still a requirement for coverage under the Social Security Act that an employer-employee relationship in fact exist.

2. That, under the Social Security Act, whether a person rendering services is an employee or an independent contractor is a matter of economic reality.

3. That, under the Social Security Act, a finding as to economic reality is to be arrived at from a consideration and examination of all the pertinent factors and of the total factual situation.

4. That in determining whether under the Social Security Act the relationship between the parties is that of employee or independent contractor, that relationship is to be established for purposes of the Act by giving equality of emphasis to each factor set forth by the Supreme Court or to any other factor of pertinence in the individual case. In making such determinations, the factor of control is not to be given paramount consideration or to have controlling emphasis placed upon it. That factor is really to be treated and considered as only one of a number of pertinent factors. Thus, the factor of control is to play a more de-emphasized role in cases having to do with coverage under the Social Security Act than it plays in tort liability cases. In Social Security Act cases, the factor of control is to stand more or less on a par with the other pertinent factors.

 There has been heretofore set forth the Regulations which had previously been promulgated relating to employer-employee relationships under the Social Security Act. The decisions of the United States Supreme Court in the cases of United States v. Silk, supra. and Bartels v. Birmingham, supra, manifestly required a revision of those regulations. On November 27, 1947, the Commissioner of Internal Revenue published, in 12 Federal Register (pp. 7966–7969), notice of his intention to revise the regulations relating to employer-employee relationships under the Social Security Act in accordance with the principles enunciated by the United States Supreme Court in the cases of United States v. Silk, and Bartels v. Birmingham, and set forth in the notice the proposed revised regulations. It was subsequently ordered that the revised regulations in the form proposed were to become effective

January 1, 1948. Their effective date has since been postponed to February 1, 1948. It is believed that those pending regulations are in accord with the principles enunciated by the United States Supreme Court in the cases of United States v. Silk, supra, Harrison, Collector, v. Greyvan, Inc., supra, and Bartels v. Birmingham, supra; and that the conclusions of the Court in the present case would not be effected if those pending regulations were in effect.

It is the holding of the Court:

(1) That the salesmen and salesman-collectors in question were employees of the plaintiff under the Social Security Act and the Federal Unemployment Tax Act;

(2) That the taxes in question heretofore paid by the plaintiff were legally due and owing by the plaintiff under the provisions of the Social Security Act and the Federal Unemployment Tax Act;

(3) That the taxes in question heretofore assessed against the plaintiff were and are legally due and owing by the plaintiff under the provisions of the Social Security Act and the Federal Unemployment Tax Act.

Judgment will be entered in accordance with this opinion.