948

Harry C. WESTOVER, Former Collector of Internal Revenue, Sixth Collection District of California, Appellant,

v.

STOCKHOLDERS PUBLISHING COMPANY, Inc., a Corporation, and George T. Goggin, Trustee in bankruptcy for its bankrupt estate, Appellees.

Robert A. RIDDELL, Collector of Internal Revenue, Sixth Collection District of California, Appellant,

v.

STOCKHOLDERS PUBLISHING COMPANY, Inc., a Corporation, and George T. Goggin, Trustee in bankruptcy for its bankrupt estate, Appellees.

No. 14647.

United States Court of Appeals Ninth Circuit.

Oct. 24, 1956.

H. Brian Holland, Asst. Atty. Gen., Ellis N. Slack, A. F. Prescott, Stanley P. Wagman, Sp. Assts. to Atty. Gen., Laughlin E. Waters, U. S. Atty., Bruce I. Hochman, Edward R. McHale, Asst. U. S. Attys., Los Angeles, Cal., for appellants.

Craig, Weller & Laugharn, Thomas S. Tobin, Los Angeles, Cal., for appellees.

Before HEALY and FEE, Circuit Judges, and WALSH, District Judge.

WALSH, District Judge.

Social Security taxes were assessed against and paid by Stockholders Publishing Company (hereinafter "taxpayer") for the years 1943, 1944, and 1945; refunds were sought and denied; and separate actions for recovery of the taxes were brought against the Collectors who had enforced the payments. The two causes were consolidated for all purposes by order of the court below and were tried without a jury. The district judge made an ultimate finding of fact, Cf. Baumgartner v. United States, 322 U.S. 665, 670, 64 S.Ct. 1240, 88 L.Ed. 1525, and concluded as a matter of law that certain persons described as "route district men" and "dealers", in respect of whose earnings the taxes in question were assessed, were not employees of the taxpayer and that their earnings were, therefore, nontaxable under the Federal Unemployment Tax Act, 26 U.S.C.A. § 1600 et seq. Judgments were entered in favor of the taxpayer and the Collectors have appealed.

The evidence in the case is without material conflict and, summarized, it presents this picture: In the years for which the taxes were assessed taxpayer was in the business of publishing a daily newspaper, "The Daily News", at Los Angeles, California. Distribution of taxpayer's newspaper was made through its circulation department, comprising office, supervisory and transportation employees, three intermediary groups designated as street district men, route district men, and dealers and, finally, street vendors and home-delivery carrier boys. The status of the route district men, who handle subscription home delivery distribution in the city area, and of the dealers, who handle either home delivery or single copy sales distribution, or both, in suburban areas, is what is here in dispute.

During all of the period here involved, there were in effect between taxpayer and each of the route district men and dealers written contracts [1] setting forth rights and obligations of the parties, respectively. In addition, taxpayer and its route district men and dealers were governed in their relationship by successive written contracts [2] made by taxpayer with the Los Angeles Newspaper Guild, the authorized collective bargaining agency for the route district men and dealers.[3] Integrating the terms and provisions of these contracts [4] and the

---

1. Hereinafter called "the individual contracts".

2. Hereinafter called "the union contracts".

3. The union contracts excluded from their coverage suburban dealers who on a daily average handled less than 500 copies of "The Daily News". However, the evidence does not show that any of the dealers involved here were so excluded.

4. Some provisions of the union contracts applied to both route men and dealers, while other provisions applied only to one or the other of these persons. No evidence was introduced on the trial to disclose which of the persons upon whose earnings the taxes were assessed were route men and which were dealers. Consequently, there is no point in our delineating the contract provisions applicable to each of the two classes and our statement of the facts, insofar as it involves provisions of the union contracts, utilizes the provisions which were applicable to the route men alone and to the route men and dealers jointly.

actual operations and dealings of taxpayer with its route men and dealers during the period in question, the following facts, bearing upon the status of the route men and dealers appear:

The route men and dealers had the task of maintaining regular and competent newspaper delivery service to certain of taxpayers' subscribers and of promoting maximum circulation of "The Daily News" by soliciting subscriptions therefor. In this regard, they were required to canvass, frequently and thoroughly, the inhabitants in the distribution areas assigned to them by taxpayer; to distribute and display advertising matter concerning "The Daily News" which was furnished to them by taxpayer; and to be available at designated times and at prearranged points in their distribution areas to pick up papers brought to them by taxpayer and get them out to readers, customarily with the help of carrier boys who were selected and engaged by them. The route men and dealers were required to maintain accurate and up to date lists of subscribers and their addresses, which lists were to be delivered to taxpayer or its representative upon request and were not to be revealed to any other person without taxpayer's written consent. The route men and dealers were under the authority of taxpayer's supervisors, who, in turn, were subordinate to a circulation director.

The route men and dealers were paid no salaries, as such, by taxpayer. Their earnings derived from the differences between what they paid taxpayer for papers and what they received for the papers from either readers or carriers. Taxpayer fixed the so-called "wholesale" price which route men and dealers paid for papers delivered to them, and taxpayer also fixed the "retail" price at which the route men and dealers sold such papers to regular subscribers and to transient buyers in their respective distribution areas. The route men and dealers fixed the prices at which they sold papers to the carriers, but such prices were "suggested" by taxpayer.

The route men and dealers paid taxpayer monthly at the so-called "wholesale" rate for all papers delivered to them in the preceding month. The profit of the route men and dealers in the case of papers sold to subscribers and transient buyers was the difference between "wholesale" and "retail" prices established by the taxpayer; and in the case of papers sold to carriers, it was the difference between the "wholesale" price paid by the route men or dealers and the price at which they sold such papers to the carriers. Route men and dealers were required to pay for their papers regardless of whether or not they had collected from subscribers or carriers, and no credit was allowed for unsold copies or any like losses except by special arrangement with taxpayer. However, under the union contracts route men and dealers were guaranteed minimum weekly net earnings.

Taxpayer fixed and prescribed the distribution area in which each route man and dealer worked and such area could not be altered by the route man or dealer. A route man or dealer could not do for a competitor of the taxpayer the work in which he was engaged for taxpayer. Route men and dealers could not permit anyone other than taxpayer to stamp any advertising matter on the newspapers delivered to them, or permit the insertion of circulars or other advertising matter in such papers before delivery of the papers to readers. A route man or dealer could be discharged at any time if in the opinion of taxpayer he was incapable or unsatisfactory in any manner, or was responsible through neglect or inattention to business for causing the circulation of "The Daily News" in his district to decrease. The union contracts provided for a forty-hour work week, paid vacations, and sick leave with pay. A worker discharged after six months service was entitled to severance pay computed on a scale increasing in accordance with his length of service. The taxpayer carried Workmen's Compensation insurance on the route men and dealers. Neither the individual contracts nor any

right thereunder or interest therein could be assigned by the route men and dealers.

The route men and dealers used their own automobiles in distributing the newspapers after they had been unloaded by taxpayer at the prearranged drop points, but on this account taxpayer paid them weekly automobile allowances computed on a mileage basis, with a fixed minimum. In computing the workers' guaranteed minimum weekly net earnings, the automobile allowance and other authorized expenses were deducted from the net difference that the workers realized between "wholesale" prices they were charged by taxpayer for newspapers and the price they in turn charged subscribers and carrier boys for the newspapers. Racks for the display of the newspapers were furnished by taxpayer. Some of the route men and dealers employed helpers and themselves paid the helpers.

Some route men and dealers had offices in their own homes, while others accepted the offer of taxpayer which made available to all of them space in taxpayer's general offices wherein they could have their desks, files and records, and wherein they could do their paper work. Neither the individual contracts nor the union contracts contained any detailed provisions as to how the workers would distribute the newspapers or solicit subscriptions; and in the actual operations, taxpayer did not give precise direction with regard to such matters. Taxpayer did, however, through its supervisors and circulation director, continuously work closely with the route men and dealers and regularly engaged them in promotional campaigns utilizing meetings with the workers, "pep" talks, the distribution of advertising material and other devices for stimulating interest and enthusiasm on the part of the workers. When a complaint regarding service was received from a reader in a worker's distribution area, it was promptly brought to his attention by his supervisor with a request for adjustment.

In our consideration of the question of the relationship between taxpayer and its route men and dealers, we are governed by certain principles which are now well settled, viz.: A realistic application is to be made of the common-law rules pertinent in determining the employer-employee relationship, and the terms "employment" and "employee" are to be construed, not in a restricted sense, but so as to accomplish the purposes of the legislation involved. Those persons are "employees" who, as a matter of economic reality, are dependent upon the business to which they render service. The degree of control which the alleged employer may or could exercise over the details of the service rendered to the business by the workers, the opportunities of the workers for profit or loss, their investment in the facilities for work, the permanency of the relation and the skill required are factors which are weighed in making the judicial determination of the relationship, but no one of these factors is controlling, nor are the courts precluded from giving consideration to other factors which bear logically upon the issue of the workers' actual economic dependence upon the business of the alleged employer. It is the total situation that controls. United States v. Silk, 331 U.S. 704, 67 S.Ct. 1463, 91 L.Ed. 1757; Bartels v. Birmingham, 332 U.S. 126, 67 S.Ct. 1547, 91 L. Ed. 1947; Ringling Bros.-Barnum & Bailey Com. Shows v. Higgins, 2 Cir., 189 F.2d 865. Applying these principles to the facts here, we think it clear that the route district men and dealers were employees within the meaning of the Federal Unemployment Tax Act.

Taxpayer here exercised at least a reasonable measure of general direction and control over the manner in which the services of the route men and dealers were performed, and the test of the employment relationship requires no more. Jones v. Goodson, 10 Cir., 121 F. 2d 176, 180; Hearst Publications v. United States, D.C., 70 F.Supp. 666, 673, affirmed per curiam 9 Cir., 168 F.2d 751. Taxpayer fixed and determined the terri-

tory in which route men and dealers would work, it controlled the hours when the work would be done, and it so completely controlled the prices of its papers, both wholesale and retail, as to enable it, if it chose, to govern the income which the route men and dealers would receive from their efforts. Taxpayer's circulation supervisors conducted continuing sales promotion campaigns with the workers, holding meetings, distributing material to stimulate circulation, criticizing distribution techniques and encouraging better work. The services performed by the workers constituted an integral part of taxpayer's business and were not incidental to the pursuit of a separately established trade or business. Route men and dealers were required to keep up to date lists of subscribers which became the property of taxpayer. They could not do the same work for any competitor of taxpayer and they were forbidden to enter into any independent arrangement with advertisers for the insertion of advertising matter in the newspapers.

In the circumstances of the case, it is not too important that taxpayer neither reserved nor exercised the right to dictate precisely when and how the distribution territories would be canvassed or precisely when and how the papers would be delivered to subscribers. To begin with, the solicitation of subscriptions and the delivery of newspapers is not such a complicated business that it requires much control of details. Further, the interrelation between the workers' financial returns and their success in obtaining subscribers and keeping them satisfied would indicate little necessity for close control of the activities of the workers. Finally, the control consequent from the very broad right of discharge possessed by taxpayer is not to be overlooked. Taxpayer had all of the control of the route men and dealers which the nature of the work required. As the court put it in Hearst Publica-

tions v. United States, supra [70 F.Supp. 675], the workers "were subject to the general control of the publishers in every respect save where control was unimportant."

The route men and dealers had no opportunity for profit or loss in any real sense. The combination of the limitation of the hours they were to work, the right the taxpayer had to fix the prices they were to pay and charge for the newspapers, and the provision made for their guaranteed minimum weekly net earnings had the effect of supplying both a floor and ceiling for their incomes. Theoretically, if the workers ordered more papers than they could sell, or if papers were stolen, lost or destroyed, there could be a loss sustained; but if there was any actual risk of loss from these causes, the guaranteed minimum weekly net earnings prevented it from being significant. Likewise, the guarantee insured against any genuine loss by reason of the expense of obtaining helpers.

Nor was there any real investment by the workers in facilities for performing their duties. Some point was made upon the trial of the fact that the route men and dealers used their own automobiles in doing their work for taxpayer, but it was not shown that any of them procured the automobiles specifically for this purpose or that they limited the use of the automobiles to the performance of such work. If the supplying of the automobiles could be considered an important factor in the case,[5] its influence disappears in the light of the fact that the workers received minimum weekly monetary allowances covering the use of the cars and the expense of operating the same.

As to the permanency of the relationship between taxpayer and its route men and dealers, the individual contracts looked to a continuing relationship rather than one ceasing at the end of a par-

5. Hearst Publications v. United States, D.C.N.D.Cal., 70 F.Supp. 666, 675; Tapager v. Birmingham, D.C.N.D.Iowa,

75 F.Supp. 375, 387; Willard Sugar Company v. Gentsch, D.C.N.D.Ohio, 59 F.Supp. 82, 84.

ticular job or result. Probably the truest picture with regard to permanency is shown by the fact that of the three workers who testified upon the trial, one had been working with taxpayer for sixteen years, the second for twenty years, and the third for thirty years; and the worker who had the shortest term of service succeeded to the district formerly held by his father for a period of fifteen years.

Taxpayer makes much of the point that no salaries or wages, as such, were paid by it to the route men and dealers but the route men and dealers received their monies from subscribers, purchasers and carriers. Taxpayer insists that this factor in the case prohibits an adjudication that the route men and dealers were employees. But the same factual situation prevailed in Hearst Publications v. United States, supra, wherein the employee relationship was found. Indeed, what was said by the court in disposing of that case determines the disposition which we must make of the case at bar:

> " * * * [T]he vendors were performing personal services constituting an integral part of the business operations of the employer, were not pursuing any separate trade, business or profession involving capital outlay, the assumption of business risks, or the performance of like services to the public generally, and were subject to general control over the manner and means of performing their services. They were, therefore, employees within the statutory purport."

From the standpoint of economic reality, it is plain that the route men and dealers were dependent upon taxpayer's business; if and when their relationship with the taxpayer was terminated they lost their source of income and, in plain language, were "out of a job" [6] like any employee. Accordingly, we hold that the relationship between taxpayer and its route district men and dealers was that of employer-employee and the taxes assessed against and collected from taxpayer are not recoverable.

The judgments are reversed and the causes are remanded with instructions to enter judgments for the defendants.

---

**6.** Two of the three workers who testified at the trial described their relationship with taxpayer in realistic fashion. One testified: "Aside from a pep talk, a letter, a promotion letter, a suggestion, let's get the boys together at the Pike, or something of that nature, I am let alone. *That is why I like my job.*" The other:

"I went and told the office that I am having quite a bit of trouble—when I say 'trouble', the collections were hard, and so forth—and I had been there quite a long time, and if I got a better district I would stay, *otherwise I would look around for another job.*"